841 So.2d 510 (2003)
John RYAN, IV, Victoria Ryan, Alin Ryan Smith and Carolina Ryan Camperio, and Robert E. Nall, as personal Representative of the Estate of Julio Lobo Olabarria, Appellants,
v.
Leonor LOBO DE GONZALEZ and Jorge Gonzalez, Appellees.
Nos. 4D00-4658, 4D01-2389.
District Court of Appeal of Florida, Fourth District.
February 26, 2003.
Rehearing Denied April 17, 2003.
*512 Gerald F. Richman, Manuel A. Garcia-Linares, Mark A. Romance and Laline Concepcion-Veloso of Richman Greer Weil Brumbaugh Mirabito & Christensen, P.A., Miami, for appellants.
George H. Moss and Casey Walker of Moss, Henderson, Blanton & Lanier, Kretschmer & Murphy, P.A., Vero Beach, for appellees.
HAZOURI, J.
John Ryan, IV, Victoria Ryan, Carolina Ryan Camperio and Alin Ryan Smith ("the children"), as assignees of Maria Luisa Lobo Ryan, and Robert Nall, as personal representative of the estate of Julio Lobo Olabarria ("the Estate"), filed suit against Leonor Lobo de Gonzalez and Jorge Gonzalez to recover the shares of Chiriqui Sugar Mills Corporation ("Chiriqui"), a Panamanian corporation holding title to sugar properties in Cuba. The trial court determined that all the claims raised in the Second Amended Complaint were barred by the statute of limitations and entered final summary judgment in favor of Leonor and Jorge Gonzalez. The children and the Estate appeal from the order of final summary judgment (Case No. 4D00-4658). Leonor and Jorge Gonzalez appeal from the trial court order denying their Motion for Sanctions/Fees and Costs Based on Proposal for Settlement (Case No. 4D01-2389). The two appeals have been consolidated.
Maria Luisa Lobo Ryan ("Maria Luisa"), who is deceased, and Leonor Lobo de Gonzalez ("Leonor") are the two daughters of Julio Lobo Olabarria ("Julio Lobo"), who is also deceased. Jorge Gonzalez is the husband of Leonor. John Ryan, IV, Victoria Ryan, Carolina Ryan Camperio and Alin Ryan Smith are the children of Maria Luisa, through whom they claim as assignees. Robert Nall is the personal representative of the estate of Julio Lobo. This case deals with a dispute over who should have possession of shares in Chiriqui Sugar Mills Corporation.
In 1957, Julio Lobo formed Chiriqui to purchase Hershey Sugar Corporation and its affiliated companies, Rosario Sugar Company and Compañía Azucarera Gómez Mena, from the Cuban Atlantic Sugar Corporation. The three properties consisted of agricultural lands, three mills and a refinery with an integrated railroad system linking the three mills. The Chiriqui shares were represented by bearer stock certificates. Julio Lobo purchased the properties for $25 million. To finance part of the purchase, he obtained a $9 million loan from First National City Bank ("City Bank") and pledged the Chiriqui shares and its underlying properties as collateral. In 1960, Fidel Castro nationalized and confiscated the properties and Julio Lobo's assets. As a result, Julio Lobo defaulted on the City Bank loan.
In 1963, the City Bank loan was renegotiated and modified by Julio Lobo. As part of the modification, the Moorings Development Company ("Moorings"), a Florida real estate development company controlled by Julio Lobo but owned 50-50 by Maria Luisa and Leonor, assumed $3.7 million of the Chiriqui debt and secured the debt with Moorings shares. In exchange, the Moorings obtained a Chiriqui promissory note in its favor in the amount of $3.7 million, the amount of the assumed debt. The parties agreed that if Julio Lobo defaulted on this restructured loan, the Moorings would receive the Chiriqui shares. Julio Lobo never made any payments on the note and was in default by 1965. The Moorings seized the Chiriqui shares but did not file any documents reflecting the seizure with the Panama Public Registry. The Moorings did not list the *513 Chiriqui shares in any of its financial statements nor in any of its tax returns.
Enrique León, Julio Lobo's Cuban attorney, testified that the Moorings seizure of the Chiriqui shares was a scheme orchestrated by Julio Lobo to protect the Moorings from the IRS and creditors. He testified that Julio Lobo considered himself the owner of the Moorings and that he expected to retain the Chiriqui shares.
In 1967, the Moorings began to operate independently of Julio Lobo despite his protests, and by 1968 he had no control in the Moorings. In 1968, the Moorings sold the Hershey trademark, a Chiriqui property, to Hershey of Pennsylvania. Julio Lobo received in excess of $100,000 from the sale but was dissatisfied with the amount.
In 1971, Julio Lobo wrote several letters to his attorneys in Miami concerning his desire to obtain control of the Moorings and the Chiriqui shares and his belief that they belonged to him. Letters written in 1972 from Julio Lobo to his Miami attorneys indicate that Enrique León, his former attorney in Cuba, reached an agreement with his daughters and that the Chiriqui shares would be returned to him. Enrique León testified that there was an agreement reached in 1972 for the return of the shares. However, subsequent letters from Julio Lobo to his attorneys indicate that Julio Lobo lost all hope that he would retain any interest in the Moorings or the Chiriqui shares. In May 1974, by letter to his attorneys, Julio Lobo indicated that based on their recommendation he decided not to enforce his rights in the Moorings or to the Chiriqui shares. He recognized that "the tax people" were after him and that if he were to succeed, all would go to the IRS. He also indicated a desire to salvage his relationship with his daughters. The children and the Estate allege that Julio Lobo decided not to take any legal action, because he reached an agreement with his daughters that the Chiriqui shares would be returned to him "at the appropriate time," as evidenced by Jorge Gonzalez's deposition testimony and letters written by Julio Lobo. However, there are no documents in the record dated after the 1974 letters to his attorneys that support the assertion that Julio Lobo had any hope of retaining the Chiriqui shares. Additionally, Jorge Gonzalez's testimony indicates that there was no agreement that Julio Lobo would receive the Chiriqui shares absent some form of consideration.
In 1980, Maria Luisa redeemed her 50% interest in the Moorings for several tracts of land which were subsequently sold for approximately $8 million. The parties dispute whether Maria Luisa was aware that the Chiriqui shares were an asset of the Moorings and whether the Chiriqui shares were factored into the compensation she received when she redeemed her interest. There is record evidence to support both parties' allegations.
Julio Lobo died in 1983 without having taken any legal action to establish an interest in the Moorings or in the Chiriqui shares.
In 1984, Leonor sold her 100% interest in the Moorings for substantially more than Maria Luisa received for her interest. Leonor did not include the Chiriqui shares in the sale. Before the sale, Leonor removed the Chiriqui shares from the Mooring's safety deposit box and kept them in a shoe box.
In 1991, John Ryan, a son of Maria Luisa, began to investigate and compile a list of Julio Lobo's assets and learned of the Chiriqui shares. Leonor acknowledged at a meeting of the Asociación Naciónal de Hacendados de Cuba (National Association of Landholders of Cuba) that *514 she and Maria Luisa shared interest in the Chiriqui shares 50-50. She acknowledged at a deposition that she did not assert more than a 50% interest in the Chiriqui shares before 1996.
In March 1996, Leonor filed a document with the Panama Registry claiming to be the 100% owner of Chiriqui and transferred her interest in the Chiriqui shares to a Florida corporation. The children and the Estate allege that this was the first time Leonor claimed 100% ownership of the Chiriqui shares, and that they first learned that Leonor was claiming 100% interest in April 1996.
Maria Luisa died in February 1998. On December 30, 1998, the children and the Estate of Maria Luisa filed suit against Leonor and Jorge Gonzalez to recover the Chiriqui shares. The following claims were asserted: constructive trust, reformation for mutual mistake, breach of fiduciary duty, declaratory judgment, negligent misrepresentation and permanent injunction. The Complaint was dismissed on the basis of the statute of limitations defense. The Amended Complaint was filed on October 1, 1999. On October 20, 1999, Leonor and Jorge Gonzalez served a proposal for settlement on the children pursuant to the offer of judgment statute, section 768.79, Florida Statutes (1997). Defendants offered each of the children $100 (for a total of $400) to settle their claims. The children declined the proposal for settlement.
On October 29, 1999, Defendants filed their Answer to the Amended Complaint, again raising the statute of limitations defense. On November 2, 1999, Defendants filed a Motion for Final Summary Judgment, arguing that all of the children's claims were barred by the statute of limitations. On April 13, 2000, the trial court denied Defendant's Motion for Summary Judgment on the basis that discovery had not been completed.
On August 4, 2000, the Second Amended Complaint was filed, adding the Estate of Julio Lobo as a plaintiff, dropping the Estate of Maria Luisa as a plaintiff and with the children proceeding as Maria Luisa's assignees. The claims asserted were the same as in the Amended Complaint. The Second Amended Complaint generally alleges as follows: Julio Lobo orchestrated the Moorings' "alleged" acquisition of the Chiriqui shares in order to protect Chiriqui from creditors and with the understanding that they would be returned to Julio Lobo "at an appropriate time"; Maria Luisa was never aware that the Moorings "allegedly" acquired the Chiriqui shares; when Maria Luisa sold her 50% interest in the Moorings she was not aware that the Chiriqui shares were part of the sale; the Moorings failed to properly seize the Chiriqui shares; Leonor did not publicly assert any ownership interest in the Chiriqui shares until 1996; the statutes of limitations with respect to all claims by the Estate did not begin to run until 1996; Leonor and Jorge Gonzalez are estopped from raising the statute of limitations as a defense because they concealed that the Moorings acquired the Chiriqui shares.
There are eight counts in the Second Amended Complaint. The Estate asserts a claim for a constructive trust in its favor for 100% of the Chiriqui shares, arguing that the Moorings held the Chiriqui shares in trust for Julio Lobo (count I). The children, as assignees of Maria Luisa, asserted a claim for a constructive trust in their favor for 50% of the Chiriqui shares, arguing that Maria Luisa was not aware when she redeemed her 50% interest in the Moorings that she was also redeeming her interest in the Chiriqui shares because Leonor and Jorge Gonzalez misrepresented *515 that the assets of the Moorings did not include the Chiriqui shares (count II). Based on these allegations, the children also asserted a claim for breach of fiduciary duty and for negligent misrepresentation (counts IV and VIII). Alternatively, the children sought reformation of the documents dealing with Maria Luisa's sale of her interests in the Moorings, arguing that the parties' intent was not to include the Chiriqui shares in the transaction (count III). The children further sought a declaratory judgment that they are 50% owners of Chiriqui (count V). The Estate sought a declaratory judgment that it owns 100% of Chiriqui (count VI) and a permanent injunction preventing Leonor from selling the Chiriqui shares (count VIII).
On August 15, 2000, Leonor and Jorge Gonzalez filed the Second Motion for Final Summary Judgment, asserting that the claims were barred by the applicable statute of limitations. They asserted that the children's claim for a constructive trust was predicated on fraud and barred by the four-year statute of limitations applicable to fraud[1] and the 12-year statute of repose[2]; the claim for reformation was barred by the five-year statute of limitations[3]; and their other legal and equitable claims were barred by the four-year statute of limitations or laches contained in section 95.11, Florida Statutes (1997). They argued that the statute of limitations on the children's claims began to run in 1980 when Maria Luisa sold her interest in the Moorings and the last of their claims expired by 1985. They further argued that equitable estoppel did not apply. With respect to the claims by the Estate, they argued the statute of limitations began to run by 1971 when it became clear to Julio Lobo that the Moorings would not give him the shares as reflected by letters he sent to his Miami attorneys. They further argued that equitable estoppel did not apply because to the extent that an agreement existed for the return of the Chiriqui shares to Julio Lobo, the agreement was part of a scheme by Julio Lobo to defraud his creditors and the IRS and unenforceable as against public policy.
The case proceeded to a hearing. Leonor and Jorge Gonzalez raised the same arguments as in their Second Motion for Summary Judgment. The children and the Estate responded that they were relying on the claim for a constructive trust, arguing that the statute of limitations did not begin to run until the claim accrued in 1996 when Leonor first asserted 100% ownership of the Chiriqui shares. In support of their argument, the children presented the financial statements and tax returns of the Moorings which failed to indicate ownership of the Chiriqui shares and the deposition testimony of Leonor where she acknowledges that she asserted 100% ownership of the Chiriqui shares for the first time in 1996. Alternatively, the children argued that the Moorings never really seized the Chiriqui shares, that the transactions relating to the Moorings acquisition of the shares was a sham and that the two sisters were holding the Chiriqui shares for their father. The children and the Estate further argued that Leonor was equitably estopped from raising the statute of limitations as a defense.
In the Final Summary Judgment, the trial court found as follows: the Moorings assumed control of the Chiriqui shares in 1966 and held them for the benefit of Julio Lobo, Julio Lobo took no actions to enforce his rights, when Maria Luisa redeemed *516 her interest in the Moorings in 1980, she was not aware that the Moorings had control of the Chiriqui shares and she was not compensated for her interest in the Chiriqui shares, and Leonor formally asserted 100% ownership of the Chiriqui shares in 1996. The trial court concluded that all claims were barred by the statute of limitations but did not specify which section applied. The trial court determined that equitable estoppel did not apply with respect to the children's claims because Maria Luisa did not know that she had a cause of action until 1996, after the statute of limitations had expired. The trial court determined that equitable estoppel did not apply to the Estate's claims because Julio Lobo knew in 1968 that his demands for the Chiriqui shares were not being honored and he took no actions prior to his death to enforce or establish his rights.
After the trial court granted summary judgment in their favor, the Gonzalezes filed a Motion for Sanctions/Fees and Costs accruing from the date the offers were rejected, pursuant to section 768.79, Florida Statutes (1997). The children's Motion to Bifurcate the issue of entitlement and the issue of a reasonable amount of attorney's fees and costs was granted.
At the hearing on the motion, the children argued that the trial court should consider the factors in section 768.79(7)(b), including the merit of the claim, the number and nature of offers made by the parties, the closeness of questions of fact and law at issue and whether it was a test case when determining the issue of entitlement to fees. They also argued that the majority of discovery took place after the offers were made.
The Gonzalezes' counsel asserted that the factors outlined in subsection (7)(b) were irrelevant to the issues of entitlement to fees and whether the offers were made in good faith. He asserted that all the necessary discovery had been completed when the offers were made. The trial court denied the motion, finding that the offer was not made in good faith.

SUMMARY JUDGMENT
The children argue that the trial court erred when it determined that their claims for imposition of a constructive trust, reformation for mutual mistake, declaratory judgment and permanent injunction were barred by the statute of limitations, because the claims did not accrue until 1996 when Leonor took the position that she owned 100% of the Chiriqui shares, two years before they filed suit on December 30, 1998. See § 95.031, Fla. Stat. (1997) (The statute of limitations "runs from the time the cause of action accrues.").
In support of their argument, they assert that the last element constituting each claim did not occur until 1996 and that the delayed discovery doctrine prevented the causes of action from accruing until 1996. See § 95.031(1), Fla. Stat. (1997) ("A cause of action accrues when the last element constituting the cause of action occurs."). Alternatively, the children argue that equitable estoppel bars Leonor and Jorge Gonzalez from raising the statute of limitations defense.
Leonor and Jorge Gonzalez argue that the claims accrued in 1980 when Maria Luisa redeemed her interest in the Moorings to Leonor, because that is when the last element constituting each claim occurred. They further assert that the delayed discovery doctrine is not applicable. We agree.
For the appellants to escape the statute of limitations defense on each of their claims other than equitable estoppel, they must rely on the doctrine of "delayed discovery." *517 As to each claim other than equitable estoppel, the statute of limitations began to run as to the Estate of Julio Lobo at the latest in May of 1974 when the record reflects that Julio Lobo had lost all hope that he would retain any interest in the Moorings or the Chiriqui shares. As for the children's claims, the statute of limitations began to run at the latest in 1980 when Maria Luisa redeemed her fifty per cent interest in the Moorings.
"The `delayed discovery' doctrine generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action." Hearndon v. Graham, 767 So.2d 1179, 1184 (Fla.2000). In Hearndon, the Florida Supreme Court determined that rather than toll the statute of limitations, the delayed discovery doctrine operates to delay the accrual of a cause of action. Id. The court held that the doctrine was applicable to childhood sexual abuse cases, given the nature of the alleged tortious conduct, its effect on victims and the general application of the doctrine to tort cases. Id. at 1186.
This Court relied upon Hearndon and extended the delayed discovery doctrine to causes of action for breach of fiduciary duty, civil theft, conspiracy, conversion, and unjust enrichment, arising from the alleged wrongful taking of plaintiff's assets after she had placed her financial affairs in defendants' hands. Monahan v. Davis, 781 So.2d 436 (Fla. 4th DCA 2001), rev. granted, 799 So.2d 217 (Fla.2001). In reaching its holding, this Court explained:
The supreme court adopted the "blameless ignorance" doctrine of Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) into Florida law in City of Miami v. Brooks, 70 So.2d 306, 309 (Fla.1954). See Hearndon, 767 So.2d at 1184. In Creviston v. General Motors Corp., 225 So.2d 331, 334 (Fla. 1969), the court explained that the holdings of Urie and Brooks

appear to crystallize in favor of application of the blameless ignorance doctrine in those instances where the injured plaintiff was unaware or had no reason to know that an invasion of his legal rights has occurred. In reality, such a doctrine is merely a recognition of the fundamental principle that regardless of the underlying nature of a cause of action, the accrual of the same must coincide with the aggrieved party's discovery or duty to discover the act constituting an invasion of his legal rights.

(Italics supplied).
Monahan, 781 So.2d at 438. But see Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co., 793 So.2d 1127 (Fla. 5th DCA 2001) (holding that the delayed discovery doctrine is not applicable to actions for tortious interference with business relationships, defamation or unfair and deceptive trade practices).
The appellants argue that this case is similar to Monahan in that Leonor prevented them from discovering that they had a cause of action until after the statute of limitations barred a suit.
The apparent conflict between Yusuf and Monahan has now been resolved by our supreme court in Davis v. Monahan, 832 So.2d 708 (Fla.2002), wherein our decision in Monahan v. Davis was quashed and in which the Court stated:
We quash the decision of the Fourth District because the delayed discovery doctrine does not apply to the claims alleged in this case. The Florida Legislature has stated that a cause of action accrues or begins to run when the last element of the cause of action occurs. An exception is made for claims of fraud *518 and products liability in which the accrual of the causes of action is delayed until the plaintiff either knows or should know that the last element of the cause of action occurred. The Legislature has also imposed a delayed discovery rule in cases of professional malpractice, medical malpractice, and intentional torts based on abuse.
Section 95.11(4), Florida Statutes (Supp.2000), provides:
Actions other than for recovery of real property shall be commenced as follows:
. . . .
(4) WITHIN TWO YEARS.
(a) An action for professional malpractice, other than medical malpractice, whether founded on contract or tort: provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence. However, the limitation of actions herein for professional malpractice shall be limited to persons in privity with the professional.
(b) An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence ....
. . . .
(7) FOR INTENTIONAL TORTS BASED ON ABUSE.An action founded on alleged abuse, as defined in s. 39.01, s. 415.102, or s. 984.03, or incest, as defined in s. 826.04, may be commenced at any time within 7 years after the age of majority, or within 4 years after the injured person leaves the dependency of the abuser, or within 4 years from the time of discovery by the injured party of both the injury and the causal relationship between the injury and the abuse, whichever occurs later.
(Emphasis added.) Aside from the provisions above for the delayed accrual of a cause of action in cases of fraud, products liability, professional and medical malpractice, and intentional torts based on abuse, there is no other statutory basis for the delayed discovery rule.
Id. at 709-10 (footnote omitted).
The Court noted that the majority of the transactions complained of occurred from 1990 to 1992 but the initial complaint was not filed until 1997 and, therefore, was barred by the statute of limitations. Likewise in the instant case, the delayed discovery doctrine does not apply and, therefore, all the appellants' claims are barred.
We now address the appellants' assertion that the doctrine of equitable estoppel operates to bar a statute of limitations defense. "The doctrine of equitable estoppel has been recognized and applied in numerous contexts by the supreme court since the inception of statehood." See Morsani v. Major League Baseball, 739 So.2d 610, 614 (Fla. 2nd DCA 1999), approved in part, 790 So.2d 1071 (Fla. 2001) (citations omitted). "The doctrine has also been recognized as a valid defense to a limitations-period defense." Id. (citations omitted). However, equitable estoppel "presupposes that the plaintiff knows of the facts underlying the cause of action but delayed filing suit because of the defendant's conduct." See Bell v. Fowler, 99 F.3d 262, 266 n. 2 (8th Cir.1996) (citing Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1329 (8th Cir.1995)) (emphasis added). Stated another way, "[e]quitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer prevails *519 upon the other to forego enforcing his right until the statutory time has lapsed." Cook v. Deltona Corp., 753 F.2d 1552, 1563 (11th Cir.1985) (quoting Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1043 n. 7 (10th Cir.1980)) (emphasis added).
In Morsani, our supreme court distinguished the doctrine as follows:
Equitable estoppel differs from other legal theories that may operate to deflect the statute of limitations, such as accrual, tolling, equitable tolling, and waiver. Equitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct. The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim.
790 So.2d at 1076-77 (footnotes omitted). The Court went on to explain:
Equitable estoppel .... is not concerned with the running and suspension of the limitations period, but rather comes into play only after the limitations period has run and addresses itself to the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. Its application is wholly independent of the limitations period itself and takes its life, not from the language of the statute, but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice. Thus, because equitable estoppel operates directly on the defendant without abrogating the running of the limitations period as provided by statute, it might apply no matter how unequivocally the applicable limitations period is expressed.
Id. at 1079 (emphasis added).
In Morsani, the trial court granted a summary judgment in favor of Major League Baseball holding that section 95.051, Florida Statutes (1993),[4] barred Morsani's claim. The second district reversed, holding that the doctrine of equitable estoppel can operate to bar a statute of limitation defense. The second district certified to our supreme court as a question of great public importance whether section 95.051 prohibits the application of the doctrine of equitable estoppel to an action filed outside of the applicable statute of limitations. The court answered the question in the negative and approved the district court's reversal of the summary judgment.
The appellants rely on Morsani and assert that it supports their position that the doctrine of equitable estoppel prevents the appellees from asserting the statute of limitation as a bar to their claims. The appellants' reliance on Morsani is misplaced. As pointed out above, equitable estoppel arises where the parties recognize the basis for a suit, but the wrongdoer prevails upon the other to forego enforcing his or her right until the statutory time has lapsed.[5] In Morsani, Major League Baseball was alleged to have induced Morsani *520 to forbear filing suit for tortious interference in Morsani's attempts to acquire the Minnesota Twins baseball franchise by promising that Morsani would be an "absolute front runner" and "at the top of the list" to obtain a majority ownership interest in a baseball franchise in time to begin the 1993 baseball season.
In the instant case, the trial court correctly ruled that equitable estoppel does not support the children's claims because Maria Luisa was not aware that she had a cause of action until 1996 (even though the last act for the accrual of the cause of action occurred in 1980) and she was, therefore, not induced to forego filing suit within the limitations period. Likewise, Julio Lobo knew in 1974, at the latest, that his claims and demands for the Chiriqui stock were not being honored and there is no evidence that he was induced to forbear enforcing his rights.

ATTORNEY'S FEES
Leonor and Jorge Gonzalez (Defendants[6]) argue that the trial court erred when it denied their motion for attorney's fees pursuant to the offer of judgment statute, section 768.79, Florida Statutes (1997).
Section 768.79 provides in relevant part:
(1) In any civil action for damages filed in the courts of this state, if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant shall be entitled to recover reasonable costs and attorney's fees incurred by her or him or on the defendant's behalf pursuant to a policy of liability insurance or other contract from the date of filing of the offer if the judgment is one of no liability or the judgment obtained by the plaintiff is at least 25 percent less than such offer, and the court shall set off such costs and attorney's fees against the award. Where such costs and attorney's fees total more than the judgment, the court shall enter judgment for the defendant against the plaintiff for the amount of the costs and fees, less the amount of the plaintiff's award ...
. . .
(7)(a) If a party is entitled to costs and fees pursuant to the provisions of this section, the court may, in its discretion, determine that an offer was not made in good faith. In such case, the court may disallow an award of costs and attorney's fees.

(b) When determining the reasonableness of an award of attorney's fees pursuant to this section, the court shall consider, along with all other relevant criteria, the following additional factors:
1. The then apparent merit or lack of merit in the claim.
2. The number and nature of offers made by the parties.
3. The closeness of questions of fact and law at issue.
4. Whether the person making the offer had unreasonably refused to furnish information necessary to evaluate the reasonableness of such offer.
5. Whether the suit was in the nature of a test case presenting questions of far-reaching importance affecting nonparties....
(Emphasis added).
"Under section 768.79, a party has the right to attorney's fees when the following prerequisites have been fulfilled: (1) a party has served a demand or offer for judgment and (2) that party has recovered a judgment at least twenty-five percent *521 more or less than the demand or offer." Levine v. Harris, 791 So.2d 1175, 1177 (Fla. 4th DCA 2001) (citing Schmidt v. Fortner, 629 So.2d 1036, 1040 (Fla. 4th DCA 1993), approved by, TGI Friday's, Inc. v. Dvorak, 663 So.2d 606, 613 (Fla. 1995)). "Whether the offeree unreasonably rejected the offer of judgment has no bearing on whether a party is entitled to attorneys' fees under the statute." Id. "The sole basis on which a court can disallow an entitlement to an award of fees is if it determines that a qualifying offer was not made in good faith." Id.
The issue is whether the trial court abused its discretion when it found that the $100 offers were not made in good faith. See Alexandre v. Meyer, 732 So.2d 44, 45 (Fla. 4th DCA 1999) (the standard of review on a finding that an offer is not made in good faith is whether the trial court abused its discretion). Defendants argue that the trial court abused its discretion when it refused to consider the limitations defense as a basis for the proposal. Defendants further argue that the trial court misapplied the law when it: analyzed the reasonableness of the offers from the standpoint of the Plaintiffs rather than Defendants, weighed the factors related to the amount of fees and denied sanctions on the grounds that the offer was "nominal." Plaintiffs argue that the trial court correctly applied the law when it determined that the offers were not made in good faith.
"The burden is upon the offeree to prove that the offeror acted without good faith." Levine, 791 So.2d at 1178 (citing Schmidt, 629 So.2d at 1041 n. 6). The children[7] rely on this court's decision in Eagleman v. Eagleman, 673 So.2d 946 (Fla. 4th DCA 1996), when arguing that the $100 offers were not made in good faith, because they were not reasonably related to the amount of damages or potential liability.
In Fox v. McCaw Cellular Communications of Florida, Inc., 745 So.2d 330 (Fla. 4th DCA 1998), this court explained:

Eagleman merely holds that nominal offers are suspect where they are not based on any assessment of liability and damages. When a nominal offer is not based on an evaluation of potential liability and damages, the offer raises a question as to the intentions of the offeror. In that circumstance, Eagleman holds that an issue of good faith arises for resolution by the trial court.
Id. at 323-33. This court emphasized that "nominal offers of judgment are not alone determinative of bad faith." Id. at 333. This court went on to stress:
[T]he question of good faith in making an offer under section 768.79 involves an inquiry into the circumstances shown by the entire record of the case. Each case requires its own analysis, and must be considered on its own facts. Whether an offer was made in bad faith involves a matter of discretion reposed in the trial judge to be determined from the facts and circumstances surrounding the offer. That determination is not controlled by a legal imperative requiring a finding of bad faith merely because the offer was nominal. Some nominal offers will have been made in good faith; some not so. The trial judge will have to consider all the surrounding circumstances when the offer was made.
Id.
In explaining the "good faith" requirement, this court stated in Schmidt: *522 We do not understand the good faith requirement of section 768.79(7)(a), however, to demand that an offeror necessarily possess, at the time he makes an offer or demand under the statute, the kind or quantum of evidence needed to support a judgment. The obligation of good faith merely insists that the offeror have some reasonable foundation on which to base the offer.
Id. at 1039 (emphasis added). The common thread running through decisions where nominal offers were made in good faith is that "the offerors in all of them had a reasonable basis at the time of the offer to conclude that their exposure was nominal." Fox, 745 So.2d at 333.
[8] This court held in Levine:

A mere belief that the figure offered or demanded will not be accepted does not necessarily suggest an absence of good faith, where the offeror fully intends to conclude a settlement if the offer is accepted as made, and the amount of the offer is not so widely inconsistent with the known facts of the case as to suggest on its face the sole purpose of creating a right to fees if it is not accepted.
Levine, 791 So.2d at 1178 (citing Schmidt, 629 So.2d at 1040 n. 5). As the third district has recognized:
The creation of the right to attorney's fees is the reason, or among the reasons, why any litigant makes an offer under section 768.79. It is the carrot held out by the statute to encourage early settlements. If we were to conclude that it is bad faith to utilize section 768.79 to obtain the right to attorney's fees, then the legislative inducement, the reason section 768.79 exists, disappears into a judicial black hole.
Lieff v. Sandoval, 726 So.2d 335, 336 (Fla. 3d DCA 1999); see also Wagner v. Brandeberry, 761 So.2d 443, 446 (Fla. 2d DCA 2000) (whether an offer is made in good faith turns on whether the offeror had a reasonable foundation upon which to make his offer and whether it was made with the intent to settle the claim should the offer be accepted); Dep't of Highway Safety & Motor Vehicles, Fla. Highway Patrol v. Weinstein, 747 So.2d 1019, 1020 (Fla. 3d DCA 1999).
Defendants argue that they made the offers in good faith, because at the time they believed the plaintiffs' claims were barred by the statute of limitations defense. They indicate that this was a reasonable assessment of the case as the original Complaint was dismissed on the basis that the claims were barred by the statute of limitations and ultimately summary judgment was granted in their favor on that basis. Defendants assert that the children did not bring forth any evidence to indicate that it was unreasonable for them to believe that they would be successful on their defense.
The evidence the children relied upon when arguing that the offer was not made in good faith was a letter Defendants sent them offering to sell them the Chiriqui shares for $3.7 million. This evidence indicates that Defendants believed the shares had great value; however, it does not indicate potential liability where the Defendants believed that there would be no damages due to the limitations defense.
The children also argued that substantial discovery had not been completed when the offers were made in support of their argument that the offers were not made in good faith. The depositions of John Groh, Enrique León, and the children had not been taken. However, as Defendants assert these witnesses' testimony was irrelevant to the statute of limitations defense. At the time the offers were made, Defendants had the letters *523 sent by Julio Lobo to his Miami attorneys and the video deposition of Maria Luisa.
Thus, there was evidence that Defendants had a reasonable foundation upon which to believe they had a viable limitations defense and made a $100 offer to each of the children on that basis. The children did not present substantial competent evidence to the contrary and there was no evidence that Defendants would not have in fact settled for the offered amount. Based on this evidence, the trial court abused its discretion when it found that the offers were not made in good faith, "as the offer did not bear a reasonable relationship to the amount of damages and a realistic assessment of liability." Further, the trial judge's statements at the conclusion of the hearing and in the Order on the motion indicate that the trial court improperly made its decisions based on an evaluation of the factors set out in subsection (7)(b), as urged by the children at the hearing. See Schmidt, 629 So.2d at 1041-42. Accordingly, the Order on Defendants' Motion for Attorney's Fees is reversed and the case remanded for the trial court to determine reasonable attorney's fees.
Affirmed in part and reversed in part.
SHAHOOD, J., concurs.
GROSS, J., concurs specially with opinion.
GROSS, J., concurring specially.
I write separately to explain why we believe that the recent case, Florida Department of Health & Rehabilitative Services v. S.A.P., 835 So.2d 1091 (Fla.2002) does not apply in this case.
The majority cites to a number of cases that stand for the proposition that equitable estoppel applies in situations where the plaintiff is aware of the facts giving rise to a cause of action, but delays filing the suit because of a defendant's conduct. To paraphrase Justice Potter Stewart's observation about hard core pornography,[8] until S.A.P., we were confident that we knew equitable estoppel when we saw it.
However, one reading of S.A.P. suggests a much broader application of the doctrine of equitable estoppel to give life to causes of action which would otherwise be swatted away by the statute of limitations.
S.A.P. involved a suit against the Department of Health and Rehabilitative Services ("HRS") for its negligence in supervising a child who had been placed in foster care. The acts giving rise to the cause of action occurred in 1979, when the plaintiff was a young child. The plaintiff was not aware of the cause of action before the statute of limitations expired. Not until 1992 did HRS release its internal investigation report documenting the abuse suffered by the plaintiff. HRS had falsified its records, so that prior to its 1992 report any "interested adult" who examined them "would have been misled into believing that [HRS] had reasonably, appropriately, and lawfully discharged its supervision duties" over the plaintiff. Id. at 1099. A counselor documented that the plaintiff had no memory of the abuse as late as 1993. The plaintiff reached the age of majority on August 8, 1994. The lawsuit was filed in January, 1995.
S.A.P. discussed the principles behind equitable estoppel:

*524 Equitable estoppel differs from other legal theories that may operate upon the statutes of limitation in that equitable estoppel presupposes an act of wrongdoingsuch as fraud and concealment that prejudices a party's case:
Equitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct. The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim. This Court has applied the doctrine for more than a century and a half.
Id. at 1097 (quoting Major League Baseball v. Morsani, 790 So.2d 1071, 1077 (Fla. 2001)).
The supreme court then notes that it is "well settled in Florida" that a statute of limitations "can be deflected by the doctrine of equitable estoppel." Id. Footnotes ten and eleven cite to a number of Florida cases supporting this proposition. All of these cases involve fact situations where the plaintiff was aware of a cause of action before the defendant's conduct which misled the plaintiff into filing suit after the statute of limitations had expired.
The two supreme court cases cited in footnote ten of S.A.P. are Barnett Bank of Palm Beach County v. Estate of Read, 493 So.2d 447 (Fla.1986) and Rabinowitz v. Town of Bay Harbor Islands, 178 So.2d 9 (Fla.1965). In Barnett Bank, the supreme court indicated that estoppel could be a defense that would excuse a claim that was untimely under the statute of limitations contained at section 733.702(1)(a), Florida Statutes (1983). Barnett Bank involved the personal representative of an estate who, in a letter to the bank, said that the "estate would recognize" amounts due under promissory notes executed by the decedent "without the necessity of the bank filing a formal claim." 493 So.2d at 448. Rabinowitz arose from an automobile accident with a bridge owned by a city. The supreme court held that by its conduct a city could be estopped to assert a statutory notice requirement. 178 So.2d at 12. Both Barnett Bank and Rabinowitz are thus cases where plaintiffs were aware of their causes of action prior to the occurrence of the defendant's conduct giving rise to an estoppel.
Similarly, the district court of appeal cases cited in footnote eleven of S.A.P. involve situations where the plaintiff knew of the facts underlying the cause of action, or where both parties recognized the basis for the suit, prior to the expiration of the applicable statute of limitations.[9]
*525 The question is whether the supreme court in S.A.P. has expanded the doctrine of equitable estoppel to apply to all situations where a defendant's conduct prevents a plaintiff from even being aware of a cause of action. Such an extension would push equitable estoppel beyond its application in any other Florida case. We therefore conclude that S.A.P. is not an extension of the law, but a case that is limited to the unique cause of action there at issue.
First, the supreme court has carved out exceptions in the law to accommodate the very special and tragic situation of abuse inflicted upon children. Thus, in Heuring v. State, 513 So.2d 122 (Fla.1987), the court held that in a case involving sexual battery within a familial context, evidence of other sexual batteries on another family member was admissible to corroborate the testimony of the child victim that the defendant had committed the sexual abuse upon the victim. Id. at 124-25. As recognized by the first district in Barton v. State, 704 So.2d 569 (Fla. 1st DCA 1997), Heuring created a "special rule" that "allows evidence of a collateral offense in limited circumstances...." Barton, 704 So.2d at 574.
In Hearndon v. Graham, 767 So.2d 1179 (Fla.2000), the supreme court held that the delayed discovery doctrine postponed the accrual of the plaintiff's cause of action against her stepfather for injuries resulting from childhood sexual abuse, where the plaintiff suffered from traumatic amnesia caused by the abuse. Id. at 1185-86. The supreme court recently explained the narrow scope of Hearndon in Davis v. Monahan, 832 So.2d 708 (Fla.2002):
While we applied the delayed discovery doctrine to causes of action arising out of childhood sexual abuse and repressed memory in Hearndon, we did so only after considering the unique and sinister nature of childhood sexual abuse, as well as the fact that the doctrine is applicable to similar cases where the tortious acts cause the delay in discovery.
Id. at 712.
S.A.P. is cut from the same cloth as Hearndon and Heuring. It is not an extension of the law of equitable estoppel, but an application of the law to a special set of circumstances.
Also, to extend equitable estoppel to cases where a plaintiff is unaware of a cause of action is inconsistent with the recent decision in Davis. There, the supreme court held that the delayed discovery doctrine did not apply to the causes of action for breach of fiduciary duty, conversion, civil conspiracy, and unjust enrichment brought by a women suffering from senile dementia. The court ruled that the delayed discovery doctrine is a creature of statute:
Aside from the provisions[10] ... for the delayed accrual of a cause of action *526 in cases of fraud, products liability, professional and medical malpractice, and intentional torts based on abuse, there is no other statutory basis for the delayed discovery rule.
Id. at 710. It does not appear that equitable estoppel was raised by the plaintiff in Davis. Under the pre-S.A.P. approach to equitable estoppel, the defense would not have applied because the defendants' conduct prevented the plaintiff from discovering their wrongdoing. Davis was not a case where the plaintiff recognized a basis for a lawsuit but was persuaded to forego enforcing her right until after the statute of limitations expired. The policy underlying equitable estoppel would certainly justify its application to the fiduciary relationship allegedly abused in Davis.[11] However, S.A.P. should not be read to let in through the back door the causes of action that would not benefit from the delayed discovery doctrine under Davis. It is unlikely that the supreme court narrowed the delayed discovery doctrine in Davis on November 7, 2002, only to have it subsumed by equitable estoppel on November 27, 2002 in S.A.P.
NOTES
[1] § 95.11(3)(j), Fla. Stat. (1997).
[2] § 95.031(2), Fla. Stat. (1997).
[3] § 95.11(2)(b), Fla. Stat. (1997).
[4] "No disability or other reason shall toll the running of any statute of limitation except those specified in this section...." § 95.051(2), Fla. Stat. (1991).
[5] We do not believe that the recent case Florida Department of Health and Rehabilitative Services v. S.A.P., 835 So.2d 1091 (Fla.2002) has drastically changed the law of equitable estoppel. We agree with the analysis of S.A.P. in Judge Gross's concurring opinion.
[6] We use Defendants and Plaintiffs in this section of the opinion to avoid confusion with Appellants and Appellees in case No. 4D00-4658.
[7] The issue as to attorney's fees pursuant to section 768.79 does not apply to the Estate of Julio Lobo because no offer was made to it.
[8] In Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), Justice Stewart wrote in a concurring opinion:

I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [hard core pornography]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.
[9] See, e.g., Jaszay v. H.B. Corp., 598 So.2d 112 (Fla. 4th DCA 1992) (holding nursing home estopped from raising statute of limitations defense when it stipulated to sixty-day extension of presuit screening period); Glantzis v. State Auto. Mut. Ins. Co., 573 So.2d 1049 (Fla. 4th DCA 1991) (determining insurer equitably estopped from raising statute of limitations defense, when it agreed to appellant's demand to arbitrate, and had helped to pick arbitrators before five-year period for claim proceeding to arbitration ended); Baptist Hosp. of Miami, Inc. v. Carter, 658 So.2d 560 (Fla. 3d DCA 1995), abrogated by May v. Ill. Nat'l Ins. Co., 771 So.2d 1143 (Fla.2000) (holding estate of decedent estopped where widow affirmatively told hospital that estate had no assets and would not be probated, where decadent's estate in fact did have assets to pay unpaid medical bills); Alachua County v. Cheshire, 603 So.2d 1334 (Fla. 1st DCA 1992) (finding mortgagee reasonably relied on representations of federal officials that his lien was valid and that would be paid by recipient of property; thus county which purchased land from federal government was estopped from raising statute of limitations defense to bar mortgagee's suit); Salcedo v. Asociacion Cubana, Inc., 368 So.2d 1337 (Fla. 3d DCA 1979) (finding where defendant secured dismissal of timely filed action by contending that the case had to be submitted to medical mediation as a medical malpractice action, the defendant was equitably estopped from thereafter reversing course and arguing that in fact there was no need for medical mediation); J.A. Cantor Assocs. v. Brenner, 363 So.2d 204 (Fla. 3d DCA 1978) (holding defendant equitably estopped where it made fraudulent misrepresentations to plaintiff that he would receive share of commissions). In one case cited in footnote eleven, City of Brooksville v. Hernando County, 424 So.2d 846 (Fla. 5th DCA 1982), the court while noting that continuing negotiations regarding a settlement, if infected with an element of deception, may create equitable estoppel, held that "[s]ince estoppel is an avoidance which was not pleaded ... the issue of the [appellant's] estoppel to assert the applicable statute of limitations was not an issue properly before the trial court based on the pleadings at the time." Id. at 848.
[10] Section 95.031(2)(a)-(b); section 95.11(4), (7), Florida Statutes (2000).
[11] Justice Lewis has identified the policy behind equitable estoppel:

Most assuredly, equitable estoppel is an age-old doctrine which has been the law in Florida since 1829, and has been applied by this Court for more than a century. It is triggered when one party "lulls another party into a disadvantageous legal position," particularly when standing in a fiduciary capacity to the complaining party. Based upon the principle that one standing in a fiduciary position must disclose all relevant information to the party depending upon him or her, equitable estoppel simply nullifies the effectiveness of an otherwise valid defense because equity deems that result repugnant to justice. Thus, where a party in such position owes another a duty, fails to fulfill that duty, and also does not disclose the breach to his or her charge, the fiduciary is estopped from asserting that the injured party's action is barred by a statute of limitations. While equitable concepts may have some limitations when arms-length transactions with total strangers are involved, such principles are more expansive when special relationships are presented.
S.A.P., 835 So.2d at 1102 (Lewis, J., concurring specially) (citations omitted).