850 So.2d 536 (2003)
TAYLOR WOODROW HOMES FLORIDA, INC., et al., Appellants/Cross-Appellees,
v.
4/46-A CORPORATION, etc., Appellee/Cross-Appellant.
No. 5D01-1581.
District Court of Appeal of Florida, Fifth District.
January 24, 2003.
Rehearing Denied June 26, 2003.
*537 David B. King and Mayanne Downs of King, Blackwell & Downs, P.A., Orlando, for Appellants/Cross-Appellees. Michael R. Levin of Baker & Hostetler, LLP, Orlando, for Appellees/Cross-Appellants.
PER CURIAM.
The Appellants/Cross-Appellees, Taylor Woodrow Homes Florida, Inc. and Monarch Homes of Florida, Inc. (Taylor),[1] appeal a final judgment awarding Heathrow Land Company (Heathrow)[2] $12.1 million in damages. Taylor argues that Heathrow failed to prove a fiduciary duty, breach of that duty, fraudulent inducement, or that the breach of the confidentiality agreement executed by Taylor caused damages and lost profits to Heathrow.[3] We reverse.

The Facts
The dispute between the parties centers around a subdivision located in Seminole County that was being developed by Arvida.[4] In late 1995, Arvida found itself in financial difficulty, and because it was in *538 default of its loans with Bank of America, development of the subdivision came to a standstill. Arvida decided to sell the subdivision, and among the many bidders competing to purchase the development were Heathrow and Taylor.
Heathrow, through its general partner, 4/46-A Corporation, which was owned by a man named George Apostolicas, was the successful bidder.[5] Apostolicas had a Harvard MBA, a law degree, and had previously developed property in the high-end residential market. Pursuant to the purchase contract, Arvida agreed to sell the development to Heathrow for $20 million dollars and set the closing date for May 31, 1996. In order to secure the purchase price, Heathrow, through Apostolicas, proceeded to make arrangements to either sell portions of the development, obtain financing, or both. Apostolicas engaged in negotiations with numerous banks, lenders, and builders to arrange the necessary financing that would allow Heathrow to close. Taylor, having been an unsuccessful bidder for the Heathrow project, initiated discussions with Apostolicas about participating in the pending acquisition.
During the negotiations between Apostolicas and Taylor, Apostolicas informed Taylor that Taylor would have to execute the confidentiality agreement that Apostolicas had previously signed for Arvida.[6] Taylor had previously signed a similiar agreement with Arvida as a bidder for the project, but the confidentiality agreement Taylor signed for Apostolicas also provided in part that certain information from Arvida would be kept confidential, used solely for the purpose of evaluating a possible transaction, and would not be used in any way that would be directly or indirectly detrimental to Arvida. The agreement also provided that Arvida promptly would be informed in the event the other party decided not to proceed with the transaction. After Taylor signed a copy of the agreement between Heathrow and Arvida, Taylor was provided a packet of documents that included documents relating to the business plan developed by Apostolicas and Heathrow.
Discussions between Taylor and Heathrow began in earnest. However, Heathrow, through Apostolicas, was also negotiating for financing with others because, according to the testimony of Apostolicas, he needed to put in place several different components that he called "frogs on a log" and "pieces of the puzzle" so that he could have back-up deals. Having these components in place would not leave him vulnerable if one component dropped out because he would have alternative financing arranged so that no single individual or entity would have leverage over him by leaving him stuck and unable to close. Apostolicas admitted that he had to have back-up deals because if one piece of the puzzle fell through it would give someone enormous leverage over him. Throughout April 1996, discussions between Heathrow and Taylor involved a joint venture and a limited partnership, all of which were ultimately rejected by Apostolicas.
On May 9th, Taylor wrote to the owner of Alaqua Lakes, which is a competitor of Heathrow in the high-end residential market, inquiring whether Alaqua Lakes was *539 available for purchase by Taylor. The letter indicated that Taylor had recently completed a due diligence on the Heathrow project and that it appeared Taylor would not be involved with that project. The letter also identified Alaqua Lakes as a major competitor of Heathrow's. The record reflects that Taylor did not immediately inform Heathrow of this inquiry. There is nothing in the record to indicate that as of May 9th, any contract or agreement existed between Taylor and Heathrow; there were only continuing discussions about Taylor's potential involvement in the Heathrow project.
The discussions between Taylor and Heathrow, at some point in time, turned to a proposed purchase by Taylor of a portion of the development identified as Parcels 26 and 27.[7] Heathrow was also negotiating with others, including Centex Homes, the Cabot Group, Morrison Homes, and Park Square, for the purchase of these two parcels. On May 13th, apparently after Centex Homes bowed out of the deal, Heathrow sent Taylor a proposed contract. On May 18th, Apostolicas wrote Taylor indicating that he could meet with Taylor on May 20th in the event Taylor still wanted to be involved with the development. Apostolicas indicated that he would fully understand if Taylor did not want to sign the contract and requested a response by May 20th so that he would have time to accept one of the other offers for the two parcels.
Taylor and Heathrow were unable to reach an agreement on Taylor's purchase of part of the development, and on May 22nd, Taylor proposed a loan with an option to purchase finished lots in Parcels 26 and 27. Apostolicas testified that either during this May 22nd discussion or the day before, he was informed by a representative of Taylor that Taylor was interested in pursuing the purchase of Alaqua Lakes. The record also reveals that a day or two earlier, a representative of Arvida informed Apostolicas that he heard Taylor was purchasing Alaqua Lakes.
Taylor and Heathrow eventually did reach an agreement embodied in a loan commitment letter dated May 31, 1996, which required Taylor to lend Heathrow $3 million dollars if numerous conditions were satisfied by Heathrow. In the commitment letter and previous drafts, Taylor revealed that it was under contract to purchase Alaqua Lakes. The loan commitment stated in part:
[Heathrow] acknowledges that due to the nature of [Taylor's] business, [Taylor] and its affiliates may from time to time be in direct competition with ... [Heathrow]. Without limiting the general nature of the foregoing, [Heathrow] acknowledges (i) [Taylor] is under contract to acquire the development known as "Alaqua Lakes" in Seminole County, Florida and (ii) in the event [Heathrow] does not purchase [the Heathrow development] or any portion of the Heathrow development, [Taylor] may buy or acquire any development not purchased by [Heathrow]; and (iii) [Taylor] has in no *540 way agreed to limit its business activities as a result of [this loan].
In the event all conditions precedent were complied with, the loan was scheduled to close on June 7, 1996.[8] On that date, Taylor's representatives traveled to Orlando for the loan closing. Apostolicas's attorney, who was required to give a satisfactory opinion letter under the loan agreement and who had been involved in the negotiations, reviewed the loan documents and advised Apostolicas that there was a potential usury problem with the loan. Despite discussions throughout the day concerning the usury issue, and other conditions that were not met, the loan did not close. Apostolicas obtained an extension of the closing date from Arvida, found a buyer for Parcels 26 and 27, and secured a loan. Heathrow then closed with Arvida and subsequently instituted suit against Taylor, alleging that Taylor realized an advantage through Heathrow's disclosure of confidential materials. Specifically, it was alleged that Taylor could differentiate Alaqua Lakes from the Heathrow subdivision to Taylor's advantage now that Taylor knew, based on the disclosed information, that Heathrow planned to compete against Alaqua Lakes. Heathrow further alleged that Taylor breached the confidentiality agreement by failing to disclose to Heathrow Taylor's negotiations with Alaqua Lakes and by failing to disclose to Heathrow Taylor's intentions not to continue negotiations with Heathrow. The jury returned a verdict in favor of Heathrow, and the court entered the judgment under review, awarding Heathrow 12.1 million dollars in damages after granting Taylor's motion for remittitur.
We will consider, in the following order, the issues of 1) whether a fiduciary duty was breached by Taylor; 2) whether Taylor fraudulently induced Heathrow into executing the loan agreement; and 3) whether Heathrow had a valid claim for breach of the confidentiality agreement. Because these issues are dispositive, the remaining issues raised by the parties are moot.

Breach of Fiduciary Duty
A cause of action for breach of a fiduciary duty is founded on a fiduciary relationship. A fiduciary relationship is based on trust and confidence between the parties where "confidence is reposed by one party and a trust accepted by the other, ...."Doe v. Evans, 814 So.2d 370, 374 (Fla.2002) (quoting Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 421 (1927)); see also First Nat'l Bank & Trust Co. of Treasurer Coast v. Pack, 789 So.2d 411, 415 (Fla. 4th DCA 2001) ("A fiduciary relationship which is implied in law is based on the specific factual circumstances surrounding the transaction and the relationship of the parties, ...." (citations omitted)); Capital Bank v. MVB, Inc., 644 So.2d 515 (Fla. 3d DCA 1994).
Unless the relationship is formed through the terms of an express agreement, the issue whether a fiduciary relationship exists will generally depend upon the specific facts and circumstances surrounding the relationship of the parties and the transaction in which they are involved. Doe; Capital Bank, 644 So.2d at 518. "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So.2d 1063, 1065 (Fla. 3d DCA 1993), review denied, 634 So.2d 629 (Fla. *541 1994). When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other. Watkins; see also Maxwell v. First United Bank, 782 So.2d 931 (Fla. 4th DCA 2001); Capital Bank; Morton v. Young, 311 So.2d 755 (Fla. 3d DCA 1975). In Watkins, the court explained:
"In an arms-length transaction, however, there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." Lanz v. Resolution Trust Corp., 764 F.Supp. 176, 179 (S.D.Fla.1991); Bankest, 717 F.Supp. at 1541; Cripe v. Atlantic First Nat'l Bank, 422 So.2d 820 (Fla.1982). Furthermore, in the absence of a fiduciary relationship, NCNB's nondisclosure of material facts in an arm's length transaction is not actionable misrepresentation unless NCNB employed an artifice or trick to prevent an independent investigation by Watkins. Hauben v. Harmon, 605 F.2d 920 (5th Cir.1979); Taylor v. American Honda Motor Co., 555 F.Supp. 59 (M.D.Fla.1982); Ramel v. Chasebrook Constr. Co., 135 So.2d 876 (Fla. 2d DCA 1961); see also Baraban v. Manatee Nat'l Bank of Bradenton, 212 So.2d 341 (Fla. 2d DCA 1968).
Watkins, 622 So.2d at 1065-66. Hence, the courts have held that, in the usual creditor-debtor relationship, a fiduciary duty does not arise and allegations of superior knowledge of a party's financial condition are generally insufficient to transform the creditor-debtor relationship into a fiduciary relationship. Watkins.
Application of these legal principles to the facts of the instant case dispels the notion that a fiduciary relationship existed between Taylor and Heathrow. Taylor and Heathrow were competitors for the Heathrow development. When Heathrow out-bid Taylor, Taylor became interested in investing in the project. Apostolicas, an experienced real estate developer who had been involved in large transactions before and who dealt with Taylor on behalf of Heathrow, knew that deals of this nature required him to, in his vernacular, acquire several "frogs on a log" to ensure that Heathrow would have the necessary financial backing to close with Arvida. Taylor was nothing more than one of the frogs and, in order to keep Taylor on the log, Apostolicas had Taylor sign a confidentiality agreement similar to that which Taylor had previously signed when it was attempting to purchase the Heathrow project. Arvida required that Apostolicas have this agreement executed by other parties from whom Heathrow was seeking financial assistance in order to protect the work-product of Arvida. As Apostolicas proceeded to negotiate with his "frogs," with the exception of Taylor, they began one-by-one to jump off his log and proceeded to other logs or lily pads.
When the proposed limited partnership and the offer to sell Parcels 26 and 27 failed to come to fruition because Apostolicas rejected the agreements and no agreement had been reached between Taylor and Heathrow, Taylor began negotiations to acquire Alaqua Lakes. Up to this time, the two competitors dealt with each other at arm's length to try to obtain an agreement advantageous to each. Taylor attempted to gain a foothold in the Central Florida high-end residential real estate market by negotiating with more than one party, just as Heathrow was negotiating with more than one party to obtain financing for its project.
Around May 13th, Taylor began to negotiate for the purchase of Alaqua Lakes and disclosure of Taylor's interest in Alaqua Lakes was first made known to Apostolicas *542 shortly before Taylor proposed the loan and option to purchase arrangement on May 22nd. According to Apostolicas, he was informed that day or the day before by a representative of Taylor that Taylor was interested in pursuing the purchase of Alaqua Lakes. Moreover, the record reveals that a day or two earlier than that, a representative of Arvida informed Apostolicas that he had heard Taylor was purchasing Alaqua Lakes. In fact, full disclosure of Taylor's interest in Alaqua Lakes was contained in the Loan Commitment Agreement and previous drafts, and despite this knowledge, Heathrow executed the Loan Commitment on May 31st, several days prior to Heathrow's scheduled closing date with Arvida. When Heathrow and Taylor appeared for the closing of the Loan Commitment Agreement, it was Heathrow's attorney who raised objections, based on his opinion that the loan was usurious. Although the parties attempted to resolve the usury problem after the closing date, they were unable to do so.
We conclude that the parties dealt with each other at arm's length, and even assuming that Heathrow reposed trust in Taylor, there is no evidence that Taylor agreed to accept it and to act to protect Heathrow. Moreover, Heathrow entered into the Loan Commitment with full disclosure of Taylor's involvement with Alaqua Lakes. The Loan Commitment specifically provided that Taylor's execution of the agreement would in no way limit Taylor's other business activities. Because this debtor-creditor relationship was an arm's length transaction, it does not serve as the foundation of any fiduciary relationship between Heathrow and Taylor. Hence, Heathrow's claim for damages for breach of fiduciary duty must necessarily fail.
We next direct our attention to the issue whether Taylor fraudulently induced Heathrow into entering the loan agreement.

Fraud In The Inducement
Taylor argues that it did not fraudulently induce Heathrow to enter into the loan agreement because it disclosed its intention to purchase Alaqua Lakes. Heathrow contends, however, that the disclosure was "too little too late."
In order to recover for fraud in the inducement, the plaintiff must prove by the greater weight of the evidence that: 1) a false statement was made regarding a material fact; 2) the individual who made the statement knew or should have known that it was false; 3) the maker intended that the other party rely on the statement; and 4) the other party relied on the false statement to its detriment. See Spitz v. Prudential-Bache Sec., Inc., 549 So.2d 777 (Fla. 4th DCA 1989); Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib. Ctr., Inc., 513 So.2d 1303, 1306 (Fla. 2d DCA 1987) (citing Joiner v. McCullers, 158 Fla. 562, 28 So.2d 823 (1947)); Alexander/Davis Props., Inc. v. Graham, 397 So.2d 699 (Fla. 4th DCA 1981); see also Lance v. Wade, 457 So.2d 1008 (Fla.1984).
Reliance on the alleged false statement is an essential element and if the evidence shows that the recipient of the statement knew it was false, reliance on the statement is unjustified. M/I Schottenstein Homes, Inc. v. Azam, 813 So.2d 91, 94-95 (Fla.2002) ("The question ... is whether the recipient of the misrepresentation is `justified in relying upon its truth.' For if the recipient `knows that it [the statement] is false or its falsity is obvious to him,' his reliance is improper, and there can be no cause of action for fraudulent misrepresentation.") (quoting Besett v. Basnett, 389 So.2d 995, 997 (Fla.1980)). Moreover, the courts have held that a party may not recover in fraud for an alleged *543 false statement when proper disclosure of the truth is subsequently revealed in a written agreement between the parties. See Hillcrest Pac. Corp. v. Yamamura, 727 So.2d 1053 (Fla. 4th DCA 1999); Englezios v. Batmasian, 593 So.2d 1077, 1078 (Fla. 4th DCA 1992) ("A party may not recover in fraud for an alleged oral misrepresentation which is adequately dealt with in a later written contract.") (citing Saunders Leasing Sys.); Tevini v. Roscioli Yacht Sales, Inc., 597 So.2d 913 (Fla. 4th DCA 1992); Federal Deposit Ins. Corp. v. High Tech Med. Sys., 574 So.2d 1121, 1123 (Fla. 4th DCA 1991) (holding that there was no justifiable reliance in the face of an express disclaimer contained in the report). In Hillcrest, for example, the court held:
Although Pacific alleges that the appellees misrepresented the "price" of the Property, the price is clearly stated in the Agreement.... A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract.
Hillcrest, 727 So.2d at 1056 (citing Englezios; Greenwald v. Food Fair Stores Corp., 100 So.2d 200 (Fla. 3d DCA 1958)).
Although Taylor did not immediately disclose its interest in Alaqua Lakes when Taylor sent its letter of inquiry to Alaqua Lakes on May 9th, Taylor's interest in Alaqua Lakes was revealed to Apostolicas by both Taylor and Arvida sometime around May 20th or 21st. Moreover, Taylor specifically disclosed its interest in Alaqua Lakes in the Loan Commitment Agreement that was executed by Heathrow and in proposed drafts that were previously sent to Heathrow. Heathrow voiced no objection upon learning of Taylor's interest in Alaqua Lakes and executed the loan agreement with full knowledge of that fact. We conclude that Heathrow could not have been fraudulently induced into entering into the Loan Commitment Agreement when it knew of Taylor's interest in Alaqua Lakes prior to executing the agreement and when full disclosure was made in the agreement.
Having concluded that Heathrow's claim for fraud in the inducement must fail, we turn to the issue whether Taylor breached the Confidentiality Agreement.

Alleged Breach Of The Confidentiality Agreement
Taylor contends that Heathrow failed to prove that it had any rights under the Confidentiality Agreement because it governed the relationship between Apostolicas and Arvida and was intended to protect Arvida's confidential information. Apostolicas informed Taylor by letter dated April 1, 1996, that Taylor would have to execute the Confidentiality Agreement previously entered into between Apostolicas and Arvida. That letter states in pertinent part:
In order to have access to the properties and their information base, I have been required to sign a Confidentiality Agreement on behalf of the proposed new corporate entity which is being formed to bid and acquire the properties. This document imposes identical restrictions and responsibilities on all parties who have access to the information provided me.
The restrictions and responsibilities imposed by the Confidentiality Agreement were placed upon Apostolicas for the protection of Arvida's rights in the information that was disclosed. Hence, Taylor's execution of the Confidentiality Agreement imposed "identical restrictions and responsibilities" on Taylor for the protection of Arvida and not for the protection of Apostolicas or Heathrow.
"A person who is not a party to a contract may not sue for breach of that contract where that person receives only an incidental or consequential benefit from the contract. The exception to this rule is *544 where the entity that is not a party to the contract is an intended third party beneficiary of the contract." Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So.2d 1028, 1030-31 (Fla. 4th DCA 1994) (citations omitted). A third party may sue under a contract as an intended third party beneficiary only if the parties express, or the contract clearly expresses, the intention to primarily and directly benefit the third party. Hirshenson v. Spaccio, 800 So.2d 670, 673 (Fla. 5th DCA 2001) ("The right of an intended, third party beneficiary to sue under a contract is recognized only if the parties clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party.") (citation omitted); Caretta.
Nowhere in the Confidentiality Agreement does it require Taylor to keep Apostolicas's information confidential, nor does it give Apostolicas rights under the Agreement. Heathrow produced no evidence at trial that Arvida intended or expressed to Apostolicas or Taylor its intention for Apostolicas to be a third party beneficiary of the agreement. Moreover, there was testimony presented that neither Arvida nor Apostolicas requested that Taylor return any information provided under the agreement. We therefore conclude that Apostolicas did not have any rights under the agreement to support a claim for breach of the agreement or fraud.

Conclusion
We conclude that the judgment rendered in favor of Heathrow must be reversed. This case is remanded to the trial court to enter judgment in favor of Taylor.
REVERSED.
PETERSON, SAWAYA and PALMER, JJ., concur.
NOTES
[1] Taylor Woodrow Homes Florida, Inc. and Monarch Homes of Florida, Inc. do business as Taylor Woodrow Communities and are referred to collectively as Taylor.
[2] 4/46-A Corporation is a general partner of Heathrow Land Company, L.P. and is hereinafter referred to as Heathrow.
[3] Heathrow filed a cross-appeal arguing that the trial court erred in granting Taylor's motion for remittitur and reducing the damages awarded by the jury from approximately $18 million dollars to approximately $12.1 million dollars. However, the issue raised in the cross-appeal is rendered moot by our resolution of the issues discussed in this opinion.
[4] The name of the subdivision is Heathrow. We note the name of the subdivision here to avoid confusion with our reference to the Appellee/Cross-Appellant as Heathrow.
[5] Taylor and Apostolicas had previously been competitors for other developments. In their previous business dealings, Apostolicas had out bid Taylor on at least one other project.
[6] Although the confidentiality agreement was between Heathrow and Arvida, the agreement required Heathrow to ensure that anyone with whom it shared Arvida's financial information also kept the information confidential. Heathrow alleged that Arvida's rights under the confidentiality agreement were therefore assigned to Heathrow.
[7] Although we cannot find in the record a precise time when the discussions between Taylor and Heathrow concerning the proposed sale of Parcels 26 and 27 began, we do find in the record a fax transmittal from Apostolicas to his banker dated May 10th that provides information about the various financial arrangements in progress to secure the necessary financing for the purchase of the development by Heathrow. Apostolicas reports that Centex Homes, an entity with whom he was negotiating, would "go hard with cash for Tracts 26 and 27 on Monday." Notably, there is no mention of negotiations between Apostolicas and Taylor regarding Taylor's proposed purchase of Parcels 26 and 27.
[8] Apparently, Apostolicas had obtained an extension of the closing date with Arvida that was originally set for May 31, 1996.