959 So.2d 288 (2007)
BROOKS TROPICALS, INC., Appellant,
v.
Alcides ACOSTA, Appellee.
No. 3D06-250.
District Court of Appeal of Florida, Third District.
April 18, 2007.
Rehearing and Rehearing Denied July 10, 2007.
*290 Stack Fernandez Anderson & Harris and Brian J. Stack, Miami, and Mindy Lee Pallott, for appellant.
Bilzin Sumberg Baena Price & Axelrod and Glen H. Waldman, Miami, and Allen J. Smith, Winter Haven, for appellee.
Before WELLS, ROTHENBERG, JJ., and SCHWARTZ, Senior Judge.
Rehearing and Rehearing En Banc Denied July 10, 2007.
WELLS, J.
J.R. Brooks & Sons, Inc. n/k/a Brooks Tropicals, Inc. ("Brooks") appeals from a final judgment in Alcides Acosta's favor on claims of breach of contract, fraud in the inducement, fraud, and breach of fiduciary duty relating to settlement of a Benlate related products liability law suit brought some twelve years earlier in which Acosta and Brooks were co-plaintiffs. Because there is no evidence to support any of these claims and because they are all barred by applicable statutes of limitation, we reverse.
Acosta and his company, Acosta Farms, Inc. are the owners of commercial mango groves located in Miami-Dade County. Brooks also owns a number of mango groves and owns a fruit packing facility as well. Some time prior to Hurricane Andrew in 1992, Neal Brooks, one of the principals of Brooks, learned that the fungicide Benlate might be responsible for a decline in his fruit production. After Hurricane Andrew, Brooks decided to pursue a claim against DuPont[1] for damage to its crops and to its packing house for lost productivity due to Benlate use.
Brooks enlisted James Zaharako, a former Brooks employee, to gather information and to assist in prosecuting Brooks' claim against DuPont. As part of his duties, Zaharako located law firms already handling Benlate cases and made arrangements for Brooks to interview these firms. Brooks ultimately selected one of these firms, Sheehe & Vendittelli, to represent it in an action against DuPont relating to the use of Benlate.
Brooks thereafter, at the Vendittelli firm's suggestion, invited a number of other growers to join this suit. In all, twelve plaintiffs, including Acosta, were named in the suit. Each executed a contingency fee agreement with Sheehe & Vendittelli and signed a client's statement of rights which confirmed his, her, or its right to communicate directly with Sheehe & Vendittelli for the purpose of: obtaining information about the case and being advised of its progress; obtaining information about and making final decisions regarding settlement; and receiving and approving a closing statement at the end of the case:
You, the client, have the right to receive and approve a closing statement at the end of the case before you pay any money. The statement must list all of the financial detail of the entire case, including the amount recovered, all expenses, and a precise statement of you lawyer's fee. . . .
You, the client, have the right to ask your lawyer at reasonable intervals how the case is progressing and to have *291 these questions answered to the best of your lawyer's ability.
You, the client, have the right to make the final decision regarding settlement of a case. Your lawyer must notify you of all offers of settlement before and after the trial. . . . However, you must make the final decision to accept or reject a settlement.
On August 11, 1993, the Vendittelli firm filed a six-count complaint against DuPont on behalf of Brooks, Acosta, and ten other plaintiffs. That complaint alleged that the plaintiffs "owned and/or operated . . . mango groves" and that Brooks "owned and operated . . . a packing facility" and sought a damage award for both the grove owners and Brooks' packing house:
As a result of the effects of Benlate on Plaintiffs' fruit and trees, Plaintiffs have suffered the following losses: (a) loss of fruit and tree material in 1988, 1990, 1991, 1992, and 1993; (b) loss of value of fruit . . . (c) loss of production . . . due to retarded growth rate and tree death or injury . . . (f) loss of income and sales in plaintiff J.R. Brooks & Sons, Inc.'s packing facility . . . as a direct result of the continuing contamination caused by the defective Benlate.
This request for relief was repeated in all six counts of the complaint, copies of which were mailed by Sheehe & Vendittelli to each of the named plaintiffs including Acosta. Acosta denied receiving a copy of this complaint.
Early in 1994, while a jury was deliberating another Benlate suit, DuPont offered to settle all of the Vendittelli firm's Benlate cases for an aggregate of $34 million. Zaharako acting on behalf of all the plaintiffs in the Brooks Benlate suit agreed to accept $3.6 million to settle all of their claims. Based on a disbursement schedule prepared by Zaharako, Vendittelli issued a check to Brooks and left it to Brooks to disburse the proceeds to each of the Brooks plaintiffs. Using the disbursement schedule prepared by Zaharako, Neal Brooks issued a settlement check to each plaintiff and forwarded the checks to each with a letter advising, "if you should have any questions concerning this settlement don't hesitate to call Zeke [Zaharako] or myself." Although Acosta acknowledged receiving the settlement check, he denied receiving this cover letter. He did, however, execute a general release in DuPont's favor.
Two years later, in mid-1996, Acosta asked his attorney of twenty years, Sharon Jones, to investigate the Benlate settlement. Over four years after that, on October 23, 2000, he brought suit against Brooks for breach of oral contract, fraudulent inducement, fraud and breach of fiduciary duty claiming that Brooks had falsely represented that all of the proceeds of the Benlate suit would be divided amongst all of the plaintiffs pro rata based on the number of acres each owned.
In September 2005, a jury returned a verdict in Acosta's favor on all four counts and awarded $335,515 in damages to him. To this, the trial court added $350,342.01 in prejudgment interest. Following denial of Brooks' motions for directed verdict, renewed motion for directed verdict, and for new trial and/or remittitur, the trial court entered a final judgment in Acosta's favor in the amount of $685,857.01. For the following reasons, we reverse.

1. The breach of contract claim
Count II of Acosta's complaint sounding in breach of oral contract alleges that Acosta and Brooks agreed that "any and all proceeds from the settlement or other favorable resolution of the Brooks suit [would be divided] . . . on a pro rata basis, based on the damaged acreage of each of the plaintiffs," and that Brooks *292 breached this agreement by failing to distribute the settlement proceeds pursuant to this agreement primarily by distributing part of the proceeds to Brooks' packing house. Acosta's own testimony refutes this claim.
The evidence was that Acosta and Brooks had done millions of dollars of business together on no more than a handshake for more than 14 years before Acosta agreed to join Brooks in the Benlate lawsuit. According to Acosta, some time after Hurricane Andrew, he, like Brooks, heard that the fungicide Benlate had been contaminated with weed killer. After approaching another grower and discussing a possible lawsuit against DuPont, he asked Brooks, from which he had purchased Benlate, to provide him with the certificates documenting his purchases. When Brooks was unable to locate the certificates, Neal Brooks suggested, in a conversation lasting only "[a] couple of minutes," that Acosta join Brooks' suit against DuPont. Acosta agreed. When asked what damages they were going to try to recover, Neal Brooks stated that it would be trees, fruit, and production. He did not state that the parties would recover based on a pro rata share of acreage owned. On direct examination by his own attorney Acosta testified:
[BY ACOSTA]. . . . So I went back to Brooks and I said, "Brooks, I need them [the Benlate certificates]. He said, "You can join us in the lawsuit. We're doing the same thing." I said, "Good. Fine. And what are we going to use to sue Benlate with?" He says, "Trees, fruit and production.
. . . .
Q. One more time, please, what was it?
A. Trees, damage to the fruit, and lost production.
In short, Acosta cannot recover for breach of an oral agreement to disburse all of the settlement proceeds from the Benlate suit "pro rata" based on the number of acres that each Benlate plaintiff owned, because Acosta's trial testimony confirms that no such promise was made. See Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A., 938 So.2d 571, 575 (Fla. 4th DCA 2006) (confirming that the "elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages") (citation omitted); J.J. Gumberg Co. v. Janis Servs., Inc., 847 So.2d 1048, 1049 (Fla. 4th DCA 2003).
We also find nothing in the promise identified in Acosta's trial testimony to preclude a claim for the packing house's losses stemming from lost fruit production. See Merin Hunter Codman, Inc. v. Wackenhut Corrections Corp., 941 So.2d 396, 398 (Fla. 4th DCA 2006) (quoting Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A., 771 So.2d 628, 631 (Fla. 4th DCA 2000), for the proposition that "[t]he interpretation of a contract is a question of law and an appellate court is not restricted in its review powers from reaching a construction contrary to that of the trial court"). As Acosta himself confirmed at trial, damages based on lost production is not equivalent to damages based on number of acres, and damages for lost production is sufficiently broad, as the Benlate complaint confirms, to encompass a claim by the packing house.[2]
*293 Even if a breach of oral contract had been proved, Acosta still would not be entitled to recover on that claim because the claim is barred by the statute of limitations.[3] Actions sounding in breach of oral contract must be commenced within four years of accruing:
(3) Within four years.
. . . .
(k) A legal or equitable action on a contract, obligation, or liability not founded on a written instrument, including an action for the sale and delivery of goods, wares, and merchandise, and on store accounts.
§ 95.11(3)(k), Fla. Stat. (2006); see ARDC Corp. v. Hogan, 656 So.2d 1371, 1373 (Fla. 4th DCA 1995) (observing "Hogan's claim was not based on a written agreement, and was thus barred by the four year statute of limitations applicable to oral contracts"). "A cause of action accrues when the last element constituting the cause of action occurs." § 95.031, Fla. Stat. (2006); Barbara G. Banks, P.A, 938 So.2d at 575 (quoting section 95.031(1) and observing "the limitations period begins to run when `the last element constituting the cause of action occurs'"). In this case, the last element of Acosta's breach of contract action occurred in mid-June 1994 when the proceeds of the Benlate suit were distributed to Acosta, allegedly not in accordance with the claimed oral contract. Since the instant action was not brought until October 2000, it is barred.
Acosta maintains that Brooks is equitably estopped from asserting a statute of limitations bar because Brooks fraudulently concealed the allegedly disproportionate distribution. See Major League Baseball v. Morsani, 790 So.2d 1071 (Fla.2001) (recognizing equitable estoppel as a bar to a statute of limitations defense). Equitable estoppel exists to bar the application of the statute of limitations where the parties recognize a basis for a suit, but the wrongdoer prevails on the other to forego enforcing that right until the statutory time has elapsed. See Ryan v. Lobo De Gonzalez, 841 So.2d 510, 519 (Fla. 4th DCA 2003). There is, however, no proof of the type of behavior that justifies application of this equitable principle in this case. To the contrary, Acosta testified that he felt that he could contact Vendittelli, Neal Brooks or Zaharako at any time with questions regarding the settlement. Yet, he raised no concerns with any of these individuals when he received the settlement and distribution even though, as he claimed at trial, he was unhappy with the distribution when he received it and immediately believed that there was something wrong. In fact, Acosta's testimony was that he made only a "very light comment to [Neal Brooks] that [the settlement] didn't seem like enough," to which Brooks responded that the settlement was the "best we could do." Later, in 1996 when Acosta went to Brooks asking if Brooks wanted to reopen the Benlate lawsuit, Brooks responded that it did not, but that Acosta could go to the Vendittelli firm for any records that he needed. Even after Acosta confronted Brooks with the settlement disbursement sheet in 1997, Brooks did nothing to lull Acosta into inaction. Rather, Acosta testified *294 that he waited almost another four years after that to bring suit because it was to his benefit, as he wanted to continue using Brooks' packing facility to package his fruit.[4]
This behavior does not amount to a concealment of the details of the settlement or the distribution which were available to Acosta through his own lawyer, Vendittelli, and his agent, Zaharako. Nor was Acosta induced to either forego further inquiry into the settlement and disbursement or to postpone legal action until after the limitations period had run. Thus, these actions could not have acted to prevent application of the statute of limitations.
As explained in Major League Baseball:
the fundamental purposes served by the statute of limitations and the doctrine of equitable estoppel are congruent. As noted above, a main purpose of the statute of limitations is to protect defendants from unfair surprise and stale claims. A prime purpose of the doctrine of equitable estoppel, on the other hand, is to prevent a party from profiting from his or her wrongdoing. Logic dictates that a defendant cannot be taken by surprise by the late filing of a suit when the defendant's own actions are responsible for the tardiness of the filing. The two concepts, i.e., the statute of limitations and equitable estoppel, thus work hand in hand to achieve a common goal, the prevention of injustice.
Major League Baseball, 790 So.2d at 1078 (footnote omitted).
To apply the doctrine of equitable estoppel to the facts as accounted by Acosta simply would eviscerate the very purpose of the statute of limitations. A verdict should have been directed on this count.

2. The fraud, fraud in the inducement, and breach of fiduciary duty claims
A verdict also should have been directed on the remainder of Acosta's claims sounding in fraud, fraud in the inducement, and breach of fiduciary duty as these claims, like the breach of oral contract claim, were all predicated on the allegation that Neal Brooks represented that the proceeds from the settlement of the Brooks suit would be distributed pro rata based on the damaged acreage each plaintiff owned, an allegation directly refuted by Acosta's own trial testimony. This is especially so with regard to Acosta's fraud in the inducement and fraud claims since Acosta testified that he did not believe Brooks was lying when he initially invited Acosta to join the Benlate suit and discussed the basis for seeking a damage award. See Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So.2d 536, 542 (Fla. 5th DCA 2003) ("In order to recover for fraud in the inducement, the plaintiff must prove by the greater weight of the evidence that: 1) a false statement was made regarding a material fact; 2) the individual who made the *295 statement knew or should have known that it was false; 3) the maker intended that the other party rely on the statement; and 4) the other party relied on the false statement to its detriment.") (citations omitted); Lopez-Infante v. Union Cent. Life Ins. Co., 809 So.2d 13, 15 (Fla. 3d DCA 2002) ("The essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation."). Thus, Acosta's own account of his discussion with Neal Brooks demonstrates he could not prevail on his fraud in the inducement and fraud claims.
The fraud in the inducement, fraud and breach of fiduciary duty claims are also barred by the applicable statute of limitations. See § 95.11(3)(j), Fla. Stat. (2006) (providing for a four year limitation period for "[a] legal or equitable action founded on fraud"); § 95.11(3)(o), (p), Fla. Stat. (2006) (limitations periods for intentional torts and actions not specifically addressed); see also Berg v. Wagner, 935 So.2d 100, 102 (Fla. 4th DCA 2006).
With regard to these claims, a cause of action accrued in August 1993 when Acosta's counsel filed the Benlate lawsuit seeking an award for Brooks' packing house, an award not related to acreage ownership. As observed in Lipsig v. Ramlawi, 760 So.2d 170, 186 (Fla. 3d DCA 2000), "[p]rofessionals, such as lawyers and accountants are always agents of their clients." See also Fla. R. Admin. P. 2.505(h) (providing "Attorney as Agent of Client. In all matters concerning the prosecution or defense of any proceeding in the court, the attorney of record shall be the agent of the client, and any notice by or to the attorney or act by the attorney in the proceeding shall be accepted as the act of or notice to the client"). As the court in Ruotal Corp., N.W., Inc. v. Ottati, 391 So.2d 308, 309 (Fla. 4th DCA 1980), noted, "[i]t is axiomatic that knowledge of the agent constitutes knowledge of the principal as long as the agent received such knowledge while acting within the scope of his authority. Bertram Yacht Yard, Inc. v. Florida Wire & Rigging Works, Inc., 177 So.2d 365 (Fla. 3d DCA 1965); 2 Fla. Jur.2d, Agencys 94 (1977)." As again highlighted in Griffith v. Investment Co., 92 Fla. 781, 110 So. 271, 271-72 (1926):
The fact that the appellant did not know of the final decree dismissing her bill to quiet title until some months after notice of it had been entered is immaterial. Her attorney was charged with knowledge of this fact, together with all other entries or decrees filed in the course of this or any other litigation or transaction in which he was acting for her. If he failed to communicate the true situation or misrepresented the facts, or failed to act for her, he is responsible to her, and she has her redress against her attorney.
Acosta's attorney knew in August 1993 that the law suit proceeds were not going to be distributed pro rata based on owned acreage. So did Zaharako, who also acted as Acosta's agent. Therefore, Acosta also knew this.
Alternatively, at the latest, these causes of action accrued when the allegedly disproportionate distribution of the settlement proceeds was made in mid-June 1994. At that time, Acosta admitted he did the math, considered the amount he should be getting and knew something was amiss. As he himself testified: "[w]hen the settlement came with the 3.6 million, I divided it, and it didn't come close to what I thought I should get." As observed in *296 Sickler v. Melbourne State Bank, 118 Fla. 468, 159 So. 678, 679 (1935):
It is too well-settled to require the citation of authorities that one who has either actual or constructive information and notice sufficient to put him on inquiry is bound, for his own protection, to make that inquiry which such information or notice appears to direct should be made, and, if he disregards that information or notice which is sufficient to put him on inquiry and fails to inquire and to learn that which he might reasonably be expected to learn upon making such inquiry, then he must suffer the consequence of his neglect.
Because Acosta did not bring this action until October 23, 2000, these claims are all barred by the statute of limitations.
The delayed discovery rule encompassed in section 95.031(2)(a) of the Florida statutes provides Acosta with no relief from the time limitation bar. This is especially true where the breach of fiduciary duty claim is involved.[5] As the Florida Supreme Court has made clear, this rule applies to only a few causes of action:
The Florida Legislature has stated that a cause of action accrues or begins to run when the last element of the cause of action occurs. An exception is made for claims of fraud and products liability in which the accrual of the causes of action is delayed until the plaintiff either knows or should know that the last element of the cause of action occurred. The Legislature has also imposed a delayed discovery rule in cases of professional malpractice, medical malpractice, and intentional torts based on abuse.
Davis v. Monahan, 832 So.2d 708, 709-10 (Fla.2002) (footnote omitted).
As Davis explains, "[t]o hold otherwise would result in this Court rewriting the statute, and, in fact, obliterating the statute." Id. at 711. Thus, any special relationship alleged between Acosta and Brooks cannot be the basis for application of the delayed discovery doctrine to any of the claims other than the fraud claims.
As to the fraud claims, for the reasons stated above, the delayed discovery doctrine has no application to the facts at hand. On these facts, the question of whether this plaintiff should have discovered the basis for a cause of action for fraud was one of law to be determined by the court. See Codding v. Phillips, 296 So.2d 554, 555 (Fla. 3d DCA 1974). The trial court erred in sending this question to the jury, which in turn incorrectly adopted Acosta's argument that his causes of action did not accrue until 1997, when his attorney, Sharon Jones, obtained from the Vendittelli firm a copy of the disbursement schedule for the settlement proceeds, clearly the last in a long line of red flags, not the first.
As previously stated, Acosta was charged with knowing what was contained in the complaint filed on his behalf on August 11, 1993, and he was charged with investigating what by his own admission he recognized as a problem with the $87,234 settlement check he received in June of 1994. Remarkably when he again *297 heard that Brooks had received a disproportionate share of the proceeds and retained lawyer, Sharon Jones, all prior to October 1, 1996, he still did not file his action within four years of even this last date. As of any of these dates, Acosta either knew about or was obligated to inquire about the facts surrounding his distribution. His failure to timely file his fraud claims within four years from even the later of those dates bars recovery.
On this analysis we need not address the other points argued by Brooks, including its claim that the damages awarded were greater than the testimony supported, and whether the amended complaint related back to the original filing of the complaint.[6]See generally McCarthy Bros. Co. v. Tilbury Const., Inc., 849 So.2d 7, 9 (Fla. 1st DCA 2003) ("A court cannot allow a jury to award a greater amount of damages than what is reasonably supported by the evidence at trial."); Patel v. School Bd. of Volusia County, 813 So.2d 135, 136 (Fla. 5th DCA 2002) ("The relation back doctrine may be applied to new parties only if the new party is sufficiently related to the original party so that no prejudice to the new party will occur.").
Accordingly, the judgment in Acosta's favor is reversed and this matter is remanded for entry of judgment in Brooks' favor.
NOTES
[1] Benlate was manufactured and sold by DuPont.
[2] In addition to Acosta's testimony as to the nature of the promise at issue, we find yet another, even more elementary problem with Acosta's breach of contract claim, in that it appears that there was no consideration for the "promise" alleged and thus, no contract. Pick Kwik Food Stores, Inc. v. Tenser, 407 So.2d 216, 218 (Fla. 2d DCA 1981) ("A binding contract requires consideration."); Kaufman v. Harder, 354 So.2d 109, 109 (Fla. 3d DCA 1978) ("[t]he law is clear that there can be no indebtedness without legal consideration").
[3] Acosta also maintained that the underlying suit incorrectly calculated his damages based on 35 acres rather than the 65 acres that he owned. However, he confirmed at trial that the faulty calculation was "a mistake." Therefore, whether argued as a claim of breach of contract or a claim of negligence, the time for asserting such a claim had long passed by the time the instant complaint was filed.
[4] Acosta testified:

Q. And the lawsuit was filed, I believe, in October of 2000
A. That's correct.
Q. That's three and a half years, three years eight months or nine months. That's a long time.
A. Yes.
Q. So why so long?
A. I  I  I waited as long as I could. I was hoping that he would come to his senses, and sit with me as a friend and work it out somehow. That never happened.
And the other reason, Glen, is, I had a lot of fruit in Homestead. There are several packing houses, but there are only two that can handle large volumes. The other packing house doesn't even have a lime machine, and their cooler space is very limited, so I also was scared to fly away and have no place to go.
[5] Section 95.031(2)(a) of the Florida Statutes, provides:

(2)(a) An action founded upon fraud under s. 95.11(3), including constructive fraud, must be begun within the period prescribed in this chapter, with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, instead of running from any date prescribed elsewhere in s. 95.11(3), but in any event an action for fraud under s. 95.11(3) must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered.
[6] October 23, 2000, Acosta Farms, Inc. brought suit against Brooks. On August 3, 2001, the circuit court granted Acosta, in his individual capacity, leave to join the lawsuit as a plaintiff. A few days later, the court granted Brooks' motion for summary judgment against Acosta Farms, Inc. based on the conclusion that Acosta Farms, Inc. had not been a party to the underlying suit against DuPont, and thus lacked standing to proceed with the instant suit.