[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 14, 2008
THOMAS K. KAHN
CLERK

----------------------------------------
No. 07-13907
Non-Argument Calendar
----------------------------------------

D.C. Docket No. 06-00384-CV-T-17-EAJ

THUNDER MARINE, INC.,

Plaintiff-Appellant,

versus

BRUNSWICK CORPORATION,
a Delaware Corporation,

Defendant-Appellee.

-------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
-------------------------------------
**(May 14, 2008)**

Before EDMONDSON, Chief Judge, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Thunder Marine, Inc. ("Thunder Marine") appeals the

grant of summary judgment in favor of Defendant-Appellee Brunswick

Corporation ("Brunswick") on Thunder Marine's breach of fiduciary duty and unfair trade practices claims. No reversible error has been shown; we affirm.

Thunder Marine sells and services recreational boats in Pinellas County, Florida; Brunswick is a manufacturer of recreational boats sold by Thunder Marine. In response to the rapid consumption of water access caused by residential condominium developments, Brunswick developed an initiative called the Access to Water Program (the "Program"). The Program -- introduced to dealers during the summer of 2004 -- encouraged dealers to call to Brunswick's attention marinas that were for sale. The Program contemplated Brunswick's evaluation of these marinas with an eye toward Brunswick acquiring marinas in partnership with its dealers.

Thomas Errath, Brunswick's General Manager of the Program, called Thunder Marine in November 2004 to explain the Program and to encourage Thunder Marine to advise Brunswick if Thunder Marine became aware of a marina for Brunswick to evaluate. In March 2005, Thunder Marine learned that the Great American Marina (the "Marina") -- where Thunder Marine performed work on its customer's yachts -- was for sale. Although Thunder Marine considered the Marina essential to its business and claims to have had the financial resources to purchase the Marina independently of Brunswick, it chose to pursue a

partnership with Brunswick through the Program. Thunder Marine brought the Marina to Brunswick's attention and was led to believe both that Brunswick considered the Marina a definite candidate for the Program and that Brunswick was considering a partnership with Thunder Marine. Thunder Marine alleges that it apprised Brunswick of the importance of the Marina to Thunder Marine and of Thunder Marine's ability to purchase the Marina without participation by Brunswick.

Over the next few months Thunder Marine sought a decision from Brunswick about going forward on the Marina with Thunder Marine; Brunswick failed to disclose to Thunder Marine the criteria used to evaluate potential properties or partnerships. Brunswick also failed to disclose that Thunder Marine did not satisfy Brunswick's partnering criteria under the Program for this Marina. And unknown to Thunder Marine, Brunswick was engaged in discussions about the Marina with Marine Max, another Brunswick dealer and a competitor of Thunder Marine.

During much of 2005, entities other than Thunder Marine, Brunswick and Marine Max,[1] put in contracts for the purchase of the Marina. In early October

---

[1] Brunswick was unaware of the availability of the Marina when Thunder Marine called it to Brunswick's attention; but Marine Max's interest in purchasing the Marina predated the Program.

2005, the Marina was again on the market; and in the light of Brunswick's seeming reluctance to pursue the Marina in partnership with Thunder Marine, Thunder Marine took initial steps to purchase the property without participation by Brunswick. Thunder Marine had secured Michael Meagher (the owner of Chevrolet dealerships) as a back-up partner on the Marina if Brunswick failed to go forward. Meetings were held with the Marina's owner and discussions had with city officials to review Thunder Marine's plans. But when Thunder Marine and its new partner arrived at the Marina in November 2005 with the intention of making an offer, they learned the property again was under contract. On 11 November 2005, Marine Max executed an agreement to purchase the Marina; the closing occurred in February 2006. In the end, the Marina was acquired through a newly formed company owned by Marine Max and Brunswick.[2]

The district court determined that no reasonable fact-finder could conclude that an implied fiduciary relationship existed between Thunder Marine and

---

[2]Brunswick maintains that it had no agreement to participate with Marine Max until the eve of closing. Thunder Marine calls our attention to extensive discussions between Marine Max and Brunswick during the time when Thunder Marine maintains it was misled to believe that, if Brunswick decided to pursue the Marina, it would do so in partnership with Thunder Marine. The sales agreement on the Marina contained a confidentiality clause; Thunder Marine did not learn the purchasers' identities until the day of closing.

Brunswick.[3]  Under Florida law, a fiduciary relationship may be implied in law based on the specific facts and circumstances surrounding the parties relationship and the transaction in which they are involved.  See Doe v. Evans, 814 So.2d 370, 374 (Fla. 2002).  "'If a relation of trust and confidence exists between the parties (that is to say where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.'"  Id. quoting Quinn v. Phipps, 113 So. 419, 421 (1927).  The indispensable condition of an implied fiduciary relationship is "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."  Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So.2d 1063, 1065 (Fla. 3d DCA 1993) (internal quotation and citation omitted).  An arms-length relationship can support no implied-in-law fiduciary obligations.  See Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp., 850 So.2d 536, 541 Fla. 5th DCA 2003 ("When the parties are dealing at arm's

---

[3]No claim is made that an express fiduciary relationship existed.  The dealer agreements entered into between Thunder Marine and Brunswick subsidiaries disclaim *expressly* the existence of a fiduciary relationship.  The district court determined that the Program-based claims asserted by Thunder Marine against the parent company Brunswick were entirely separate from and collateral to the dealer agreements.  So we assume that the express denial of a fiduciary relationship in these agreements constitutes no express disclaimer of a fiduciary relationship between Thunder Marine and Brunswick for Program-based claims.

length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other.").

For summary judgment purposes, we view all facts and draw all reasonable inferences in the light most favorable to Thunder Marine, the non-movant; the true facts may prove to be otherwise. See Mangieri v. DCH Healthcare Authority, 304 F.3d 1072, 1073 n. 2 (11th Cir. 2002). Even so viewed, the record allows no imposition of implied-in-law fiduciary obligations: Thunder Marine failed to proffer sufficient indicia of (1) dependency of Thunder Marine on Brunswick; (2) a disparity of savviness between Thunder Marine and Brunswick on marina real estate investments generally or the Marina in particular; or (3) an acceptance by Brunswick of a duty to counsel or otherwise protect Thunder Marine. Thunder Marine and Brunswick had a long-standing arms-length relationship through Brunswick subsidiaries; a successful relationship may have inclined Thunder Marine to proceed without securing some agreement about the proposed marina venture. But we fail to see support in the record to show that this pre-existing arms-length manufacturer-dealer relationship was transformed into a fiduciary relationship when the parties shifted to direct discussions about the Program.

We also note -- as did the district court -- that, even if we were to assume a material issue of fact exists sufficient to create a jury issue on the nature of the

6

relationship between Thunder Marine and Brunswick, the record is undisputed that Thunder Marine understood the Marina was available for sale for a period in October and November 2005, knew that other entities had been interested in the Marina, understood that Brunswick was under no obligation to partner with Thunder Marine and doubted it would do so. Thunder Marine arranged a back-up partner with whom it could act if and when the Marina became available; and when that happened in October 2005, Thunder Marina had the opportunity to purchase the Marina. But no offer was made or option to purchase secured before the property again went under contract, this time to Marine Max. Brunswick's earlier representations were not the proximate cause of Thunder Marine's loss of the Marina.[4]

AFFIRMED.

---

[4] As discussed by the district court, the causal break between Brunswick's alleged misconduct and the damages claimed by Thunder River is fatal to Thunder River's unfair trade practice claim, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201.