[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14236
_____

D.C. Docket No. 9:12-cv-80247-DMM


BVS ACQUISITION CO., LLC,
a Delaware Limited Liability Company,
ARTHUR W. HOOPER,
an individual,

Plaintiffs -
Counter Defendants -
Appellants,


versus

RORY A. BROWN,
an individual,

Defendant -
Counter Plaintiff -
Appellee,


JEROME M. ELLIS,
an individual,
LYDIAN HOLDING COMPANY,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 28, 2016)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and GOLDBERG,[*] Judge.

PER CURIAM:

On appeal, BVS Acquisition Co., LLC and Arthur W. Hooper, Jr. (collectively, "BVS") first challenge a final order granting summary judgment in favor of Rory A. Brown, then the chairman and CEO of the now-defunct Lydian Private Bank ("Lydian Bank"), on claims of negligent misrepresentation and breach of fiduciary duty relating to an unfortunate investment in Lydian Bank's preferred stock. For the reasons stated in its order granting summary judgment on BVS's claims,[1] the District Court properly held in favor of Brown. We therefore affirm the grant of summary judgment to Brown on BVS's claims for negligent misrepresentation and breach of fiduciary duty.

---

[*] The Honorable Richard W. Goldberg, Judge for the United States Court of International Trade, sitting by designation.

[1] A copy of the District Court's order granting summary judgment in favor of Brown on BVS's claims of negligent misrepresentation and breach of fiduciary duty is appended to this opinion.

2

BVS next challenges the District Court's separate order granting summary judgment in favor of Brown on his counterclaim for indemnification of the attorneys' fees and costs incurred defending BVS's claims.  As explained below, the District Court erred by interpreting the disputed indemnification provision to cover Brown's expenses incurred in defending against BVS's claims.  We therefore reverse the grant of summary judgment on Brown's counterclaim for indemnification.

Whether Brown is entitled to recover his attorneys' fees and costs pursuant to his counterclaim—the sole remaining issue on appeal—turns on the meaning, under Florida law, of the indemnification provisions of the Subscription Agreement entered into by BVS and Lydian Bank for BVS's purchase of millions of dollars of Lydian Bank preferred stock.[2]  Those provisions provide as follows:

> 4.    Indemnification.  My investment in the Shares, if accepted by you, was based upon my representations, warranties and acknowledgments set forth in this Subscription Agreement.  I understand the meaning of the representations I have made in this Subscription Agreement, and I hereby agree to indemnify you and all of your officers, directors, employees, agents, attorneys and other representatives, and all persons deemed to be in control of the foregoing, and to hold such persons harmless, from and against any

---

[2] Brown can raise claims pursuant to the Subscription Agreement even though he was not a party to it because, as then the chairman and CEO of Lydian Bank, he was clearly an intended third-party beneficiary of the indemnification provisions, which provide coverage for Lydian Bank's "officers, directors, employees, agents, attorneys, and other representatives." *See generally Found. Health v. Westside EKG Assocs.*, 944 So. 2d 188, 194–95 (Fla. 2006).

3

and all loss, damage, liability or expense, including costs and reasonable attorneys' fees, to which they may be put or which they may incur by reason of, or in connection with:

     4.1    any misstatement, misrepresentation or omission made by me or on my behalf with respect to the matters described in this Subscription Agreement; or

     4.2    any breach of any representations or warranties or any failure to fulfill any covenants or agreements set forth in this Subscription Agreement, including, but not limited to, any sale, transfer or other disposition of all or any part of the Shares by me in violation of the Securities Act or other applicable law.

All representations, warranties and covenants contained in this Subscription Agreement, and the indemnification contained in this Section 4, will survive your acceptance of my subscription.

The District Court read these provisions, according to their natural meaning, as an agreement that Brown would be entitled to indemnification if BVS breached one of its representations or warranties in the Subscription Agreement. Noting that BVS had represented elsewhere in the Subscription Agreement (1) that it was "relying solely on the advice of [its] personal advisors," (2) that Brown had made "no representations," and (3) that there would be no liability "for any representations [made by Brown or other specified Lydian Bank officials] except for those contained in the Subscription Agreement and Private Placement Memorandum,"[3]

---

[3] The "Private Placement Memorandum" mentioned in the Subscription Agreement refers to the materially indistinguishable portions of a pair of documents describing the terms of Lydian Bank's stock offering that were initially reviewed by BVS.

4

the District Court reasoned that BVS breached those three representations by bringing claims against Brown for negligent misrepresentation and breach of fiduciary duty.  The District Court concluded that Brown, who "was forced to defend himself against [BVS's] claims," had thus "set forth sufficient facts to demonstrate that he is entitled to indemnification under the Subscription Agreement."

We disagree.  We start, as did the District Court, with the well-established proposition that under Florida law contractual language, when possible, is to be interpreted according to its plain meaning in line with "generally accepted rules of construction" to give effect to the intent of the contracting parties.  *See, e.g.*, *Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co.*, 133 So. 3d 494, 497 (Fla. 2014).  Likewise well-established is the proposition that indemnification clauses are similarly "subject to the general rules of contractual construction."  *Dade Cty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 643 (Fla. 1999) (citing *Univ. Plaza Shopping Ctr. v. Stewart*, 272 So. 2d 507, 511 (Fla. 1973)).  Where we part ways with the District Court's analysis, however, is over the rules of contractual construction that govern indemnification clauses.  These rules, instead of favoring

5

an interpretation that BVS and Brown intended coverage for the expense of

Brown's defense against BVS's claims,[4] directly cut against such an interpretation.

Generally speaking, "[a] contract for indemnity is an agreement by which

the promisor agrees to protect the promisee against loss or damages *by reason of*

*liability to a third party*." *Id.* at 643 (emphasis added) (citing *Royal Indem. Co. v.*

*Knott*, 136 So. 474, 479 (Fla. 1931)). That is, it is generally *not* the case that an

indemnity clause will be understood to include protections for the expense of

liability caused by the indemnified party itself. Accordingly, any departure from

this default position[5] is to be made in "clear and unequivocal terms." *Stewart*, 272

So. 2d at 509–511. Unless the Subscription Agreement's indemnification

provisions clearly and unequivocally indicate that BVS and Brown intended

---

[4] The District Court relied exclusively on this Court's decision in *Shannon v. Kaiser Aluminum and Chemical Corporation*, 749 F.2d 689 (11th Cir. 1985) (per curiam), which contained the following statement of Florida law: "Under Florida law, the general rule is that an indemnitee under an indemnification agreement is entitled to recover reasonable attorney's fees and legal costs which he is compelled to pay as a result of suits brought against him relating to matters for which he is entitled to be indemnified." *Id.* at 690 (citing *Brown v. Fin. Indem. Co.*, 366 So. 2d 1273, 1274 (Fla. Dist. Ct. App. 1979)). Though we have no cause to doubt the continued validity of this statement, the scope of the "matters for which [an indemnitee] is entitled to be indemnified" necessarily turns on the underlying indemnification clause.

Here, therefore, we cannot rely solely on the general rule described in *Shannon* to give effect to the parties' intended meaning. Rather, we must examine the Subscription Agreement's indemnity provisions together with the relevant rules of contractual construction to determine whether there is coverage for Brown's expenses.

[5] We note that this default position—under which indemnity clauses are generally understood to be limited to coverage for liability to a third party—mirrors "the so-called American Rule"—that litigants are to ordinarily bear their own attorneys' fees—which Florida "fully endorses." *See Gen. Motors Corp. v. Sanchez*, 16 So. 3d 883, 884 (Fla. Dist. Ct. App. 2009).

6

coverage for expenses like those incurred by Brown in defending BVS's claims, then we will presume no such coverage. With this clear-and-unequivocal standard in mind, we turn next to the language of the contested indemnity provisions.

As noted above, the provisions in question state, in relevant part, that there will be indemnification "from and against any and all loss, damage, liability or expense" incurred "in connection with . . . any breach of any representations or warranties." Though this broadly worded language may initially appear capable of sustaining the interpretation adopted by the District Court and urged by Brown on appeal, the clear thrust of Florida case law on what constitutes a clear-and-unequivocal statement shows otherwise.

Although we are not aware of a Florida decision exactly on point, the Second District Court of Appeal recently surveyed how similar indemnity clauses have fared historically. *See generally On Target, Inc. v. Allstate Floridian Ins. Co.*, 23 So. 3d 180 (Fla. Dist. Ct. App. 2009); *see also Cox Cable Corp. v. Gulf Power Co.*, 591 So. 2d 627, 629 (Fla. 1992) (holding the parties' intent to cover the indemnitee's own negligence was insufficiently clear and unequivocal in an indemnification clause providing that the indemnitor "shall indemnify, protect and save [the indemnitee] forever harmless from and against any and all claims and demands for damages to property and injury or death to any persons . . ."); *Stewart*, 272 So. 2d at 508–09 (same for clause providing indemnification for "any and all

7

claims for any personal injury or loss of life"); *Gulf Oil Corp. v. Atl. Coast R.R. Co.*, 196 So. 2d 456, 457 (Fla. Dist. Ct. App. 1967) (same for clause providing indemnification for "all loss, costs, expense and damage to persons or property"); *Fla. Power & Light Co. v. Elmore*, 189 So. 2d 522, 523 (Fla. Dist. Ct. App. 1966) (same for clause providing indemnification for "any liabilities whatsoever"). While the *On Target* Court ultimately held that the indemnification provision before it clearly and unequivocally provided the contested coverage because of "language specifically designating indemnification against one's own negligence," *see* 23 So. 3d at 184–85 (quotation marks omitted),[6] there are two primary insights that emerge from the surveyed cases. First, the clear-and-unequivocal standard is difficult to meet and requires an express statement that the parties intend to depart from the default position of no coverage. Second, broad but general language is insufficient to qualify as an express statement to that effect.

Applying these insights, we hold that the Subscription Agreement's indemnification provisions, which are broadly worded and do not otherwise

---

[6] The *On Target* Court was reviewing an indemnification provision in a contract for residential leak-detection services. After a pair of homeowners had their request for repairs to damaged tile flooring approved pursuant to their homeowner's insurance, their insurance provider sued the leak-detection service for the cost of the repairs. The leak-detection then filed suit against the homeowners for the attorneys' fees and costs incurred in defending the insurance company's lawsuit. The court concluded that the language of the contested indemnification provision—holding the leak-detection service harmless in the event of damage "which may result from any [leak-detection] locating procedures"—clearly and unequivocally provided for the indemnity sought by the leak-detection service. *See On Target*, 23 So. 3d at 181–82, 184–85.

8

expressly address the issue, do not clearly and unequivocally indicate that BVS and Brown, who are highly sophisticated parties, intended to depart from the default position of excluding coverage for the expense of defending BVS's claims against Brown. We will not, therefore, give the Subscription Agreement's indemnification provisions a more-expansive sweep than the parties intended. *See Beach Resort Hotel Corp. v. Wieder*, 79 So. 2d 659, 663 (Fla. 1955) (en banc) ("It is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain."). As the indemnification sought by Brown is not contained in the Subscription Agreement as a matter of Florida law, his counterclaim fails. The District Court erred by concluding otherwise.

Accordingly, the District Court's grant of summary judgment to Brown on BVS's claims of negligent misrepresentation and breach of fiduciary duty is AFFIRMED. The District Court's grant of summary judgment to Brown on his counterclaim for indemnification is REVERSED. The case is REMANDED to the District Court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

APPENDIX[†]

## ORDER GRANTING DEFENDANT BROWN'S MOTION FOR SUMMARY JUDGMENT DISMISSING THIRD AMENDED COMPLAINT

THIS CAUSE comes before the Court upon Defendant Rory Brown's ("Brown") Motion for Summary Judgment Dismissing Third Amended Complaint (DE 155) ("Motion") filed on September 10, 2012.  Plaintiffs, BVS Acquisition Co., LLC and Arthur Hooper's (collectively, "Plaintiffs"), responded to the Motion (DE 180) on September 27, 2012, to which Brown replied (DE 180) on October 5, 2012.  I have reviewed the Motion and the record in this matter, and am otherwise fully advised in the premises.

## I.    Background[1]

This is a diversity action for damages for negligent misrepresentation (Count I) and breach of fiduciary duty (Count II) pursuant to 28 U.S.C. § 1332.  DE 151 at ¶ 4-5.  This action arises from Brown's purported statement as Lydian Private Bank's ("Lydian Bank") chairman and CEO concerning the financial situation of

---

[†] With the exception of minor changes to formatting and numbering, this Appendix reproduces in full the District Court's order of October 29, 2012, granting summary judgment to Brown on BVS's claims for negligent misrepresentation and breach of fiduciary duty.

[1] The following facts are those from the Third Amended Complaint and the Parties' Statements of Material Facts that are supported by evidence in the record.  As the background facts surrounding Plaintiff and Defendant's relationship are extensive, the Court sets forth here only those facts that are relevant.  For a detailed rendition of the procedural background of this case, *see* DE 196.

the bank.  Plaintiffs assert that as a result of their reliance on Brown's misrepresentations, they purchased 10 million dollars Lydian Bank stock.  Prior to purchasing the stock at issue, Plaintiffs were provided an opportunity to read and review a Confidential Private Placement Memorandum[2] ("PPM") before signing a Subscription Agreement, which together constituted the entire agreement between the parties.

Plaintiffs claim that they were approached as potential wealth management clients of Lydian Bank, but that Brown persuaded them to purchase shares of Lydian Bank instead.  Specifically, Plaintiffs state that they relied on the following statements made by Brown in deciding whether to invest in Lydian Bank:

- that the Bank would either be sold or taken public in the near future;

- that the Bank was in a strong condition and had over-reserved for potential losses;

- that the Plaintiffs' investment would be used principally to expand the wealth management services of the Bank;

- that the Bank had taken care of its "legacy loans" and considerably trimmed its residential mortgage portfolio; and

---

[2] It is undisputed that the relevant provisions of the May PPM (DE 151-1) and June PPM (DE 151-2) are identical.

2

- that the FDIC would give the Bank the opportunity to buy failed bank.

DE 179 at ¶ 21. Plaintiffs assert that Brown was aware that his statements were false, "based on his position as the dominant CEO of Lydian Bank, his superior knowledge of Lydian Bank's financial condition and operations, his ability to conduct due diligence based upon his position as an officer and director of Lydian Bank, and the scope of information available to him in these capacities." DE 151 at ¶ 49.

Plaintiffs also claim that Brown failed to disclose: (1) the fact that Ellis received a commission in connection with Plaintiffs' investment; (2) the severity of the May 2009 Memorandum of Understanding with the Office of Thrift Supervision; (3) that Lydian Bank had not implemented the policies mandated by the OTS; (4) Lydian's subordinate debt should have offered yields that double the dividend offered to Plaintiffs; and (5) that Lydian Bank had made a provision for a bad debt expense of more than $27 million at the end of June 2009. *Id.*

In addition to their claims for negligent misrepresentation, Plaintiffs assert a claim against Brown for breach of fiduciary duty because of his failure to disclose the aforementioned facts prior to their execution of the Subscription Agreement. Plaintiffs also argue that Brown violated his fiduciary duty to them as stock holders as a result of his involvement with a transaction with Sherman Financial Services

3

("Sherman"). In late 2008, Lydian Bank issued a $20 million loan to Sherman and Sherman consequently purchased $15 million in Lydian Bank's preferred shares. Lydian Bank's accounting of these two transactions caused the bank to appear as if it had $15 million more equity than what was recognized under Generally Accepted Accounting Principles. DE 151 at 6. As a result, the OTS required Lydian Bank to restate its financial statements to accurately reflect its capitalization in 2010. Because Lydian Bank had misstated its net worth, it was eventually into FDIC receivership which caused Plaintiffs to lose their investment. Thus Plaintiffs argue that Brown's misrepresentations and omissions caused the loss of their entire investment in Lydian Bank.

## II.    The Parties' Arguments

In his Motion, Brown argues that Summary Judgment in his favor is appropriate because (1) Plaintiffs' alleged reliance on Brown's statements is unreasonable as a matter of law; and (2) Plaintiffs have failed to establish that Brown breached a fiduciary duty to them. Specifically, Brown asserts that the language in the Subscription Agreement effectively disclaimed any representations made by Brown because it contradicts the express terms of Brown's statements, thereby rendering Plaintiffs' reliance unreasonable as a matter of law. Likewise, Brown contends that his liability for purported omissions was disclaimed by the language of the PPM and Subscription Agreement. Brown further asserts that

4

Plaintiffs' claim for a breach of fiduciary duty cannot succeed because he owed no fiduciary duty to Plaintiffs, and Plaintiffs lack standing to assert "post-purchase" claims of fiduciary duty. *See generally*, DE 162-2; DE 155.

In their Response in Opposition to the Motion, Plaintiffs make several arguments: (1) Plaintiffs' negligent misrepresentation claims are not barred by the PPM or Subscription Agreement; (2) there are material issues of fact concerning whether their reliance on Brown's statements was reasonable; and (3) that Brown owed them fiduciary duties. In support of their claim, Plaintiffs assert that the PPM is ambiguous on its face, and that Brown's omissions while discussing Plaintiffs' investments are actionable despite the language of the Subscription Agreement. Plaintiffs also assert that under Florida law, individual officers of a corporation, while acting in the scope of employment for such corporation, may be subjected to personal liability for torts committed under their supervision, thus subjecting Brown to personal liability for breach of fiduciary duty. *See generally*, DE 180.

In his Reply, Brown claims that under Florida law, contracts must be interpreted to give meaning to all applicable provisions, no fiduciary obligation existed and Brown's status as a third party is irrelevant in considering the subscription agreement. *See generally*, DE 185.

5

## III.    Legal Standard

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Federal Rule of Civil Procedure 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

An issue of material fact is genuine where the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *See Mize v. Jefferson City Bd. of Educ.*, 93 F. 3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F. 3d 913, 919 (11th Cir. 1993)). A district court's central inquiry when determining whether it should grant a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A district court must grant summary judgment against a party who fails to establish the existence of an element essential to his case that he bears the burden of proof on during trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of demonstrating to the court that the record does not contain any genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991).

6

Whether a fact is material or not is a question that requires the moving party to defer to substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 106, 248.  Pursuant to Rule 56, a moving party may accompany its motion for summary judgment with supporting affidavits; however, the movant is not required to file any affidavits.  *See* Fed. R. Civ. P. 56(a)-(b).  A district court may not consider an unsworn statement when "determining the propriety of summary judgment." *Gordon v. Watson*, 622 F. 2d 120, 123 (11th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159 (1970)).

    "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F. 3d 590, 593-94 (11th Cir. 1995) (per curiam) (internal citation and quotations omitted).  In addition, the dispute must have a "real basis in the record" in order to constitute a genuine dispute of fact.  *Pace v. Capobianco*, 283 F. 3d 1275, 1278 (11th Cir. 2002) (quoting *Mize*, 93 F.3d at 742) (internal quotations omitted).  Thus, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F. 3d

7

1321, 1327 (11th Cir. 2005).  Further, conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment.  *See Earley*, 907 F. 2d at 1081.  The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment.  *See Celotex*, 477 U.S. at 322-23.

While conclusions and unsupported facts alone are insufficient to oppose a summary judgment motion, a district court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Haves v. City of Miami*, 52 F. 3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F. 3d 1571, 1578 (11th Cir. 1994) (per curiam)). Applying the foregoing standards to the instant case, I will address each count from the Complaint in the order in which they are pled.

## IV.    LEGAL DISCUSSION

### A.  NEGLIGENT MISREPRESENTATION

Brown argues that Plaintiffs' reliance on his statements was unreasonable as a matter of law because their reliance on Brown's statements contradicts the

8

express terms of the Subscription Agreement.[3]  However, Plaintiffs assert that this language was rendered meaningless by the language in the PPM authorizing Brown, Ellis and other officers at Lydian Bank to make representations concerning the subscription agreement and PPM.

An important aspect of establishing a *prima facie* claim for negligent misrepresentation is the requirement that the plaintiff reasonably rely on the statements in question.[4]  *See Foreline Sec. Corp. v. Scott*, 871 So. 2d 906, 910 (Fla. 4th DCA 2004) (noting that actions for both fraudulent and negligent misrepresentations require reliance).  In Florida, the law is clear that "any reliance on the defendant's misrepresentations is unreasonable" where it contradicts the express terms of a subsequent written agreement.  *See Schubot v. McDonalds Corp.*, 757 F. Supp. 1351, 1356 (S.D. Fla. 1990) (applying Florida law), *aff'd*, 963 F. 2d 385 (11th Cir. 1992); *Englezios v. Batmasian*, 593 So. 2d 1077, 1078 (Fla.

---

[3] The Subscription Agreement provides that "[Plaintiffs are] relying, if at all, solely on the advice of [their] personal advisers with respect to [their] investment."  DE 153-3 at ¶ 2.7.

[4] A claim for negligent misrepresentation requires proof that:

(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely ... on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.

*Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 653 (F1a. 3d DCA 2006) (citing *Simon v. Celebration Co.*, 883 So. 24 826, 832 (Fla. 5th DCA 2004).

4th DCA 1992); *Federal Deposit Ins. Corp. v. High Tech Medical Systems Inc.*, 574 So. 2d 1121, 1123 (Fla. 4th DCA l991).

The Subscription Agreement states that:

[Plaintiffs] have had an opportunity to consult with counsel and other advisers about an investment in the Shares. [Lydian Bank has] made available all documents, records and books pertaining to this investment reasonably requested by me and/or my advisors. [Lydian Bank has] offered [Plaintiffs]/and or [their] advisors the opportunity to ask questions and receive answers from Rory Brown . . . concerning the business and the terms and conditions of this investment.

*Id.* at ¶ 3.3. It then provides that Plaintiffs "(either personally or together with [their] Purchaser Representative) such knowledge and experience in business and financial matters that [they are] capable of evaluating the merits and risks of the investment in the Shares," and that Plaintiffs "relied *solely* upon the advice of [their] advisors (if any) and independent investigations made by [them] and/or [their] representative(s) in deciding to invest and no oral and other representations have been made to me regarding the shares." *Id.* at ¶¶ 3.4-3.5 (emphasis added). Further, the Subscription Agreement was intended to be executed after reading and reviewing the PPM as evidenced by the language stating that "[Plaintiffs] received and carefully read and am familiar with this Subscription Agreement, [and] the

10

Bank's Confidential Private Placement Memorandum. . . ."  DE 151-3 at ¶ 2.1.[5]

Thus, the potential for liability created by representations of Lydian Bank's officers

under the PPM was eliminated upon execution of the Subscription Agreement

because any reliance on such statements contradicts the express language of the

subsequently executed agreement, rendering them unreasonable as a matter of law.

Plaintiffs' claims arising from Brown's omissions concerning Lydian Bank's

financial status are also unreasonable as a matter of law because they were

disclosed in the PPM.[6]  The Subscription Agreement mandated that Plaintiffs be

cognizant of the "RISK FACTORS"[7] disclosed in the PPM, which addressed

---

[5] Because the potential for liability arising from Brown's statements was explicitly contemplated and disclaimed in the Subscription Agreement, Brown's status as a third party does not prevent him from benefiting from the disclaimers contained in the Subscription Agreement, and Plaintiffs' reliance on such statements is unreasonable as a matter of law. *See Schubot v. McDonalds Corp.*, 757 F. Supp. 1351, 1356 (S.D. Fla. 1990) (applying Florida law), *aff 'd*, 963 F. 2d 385 (11th Cir. 1992).

[6] Plaintiffs claim that Brown failed to disclose: (1) the fact that Ellis received a commission in connection with Plaintiffs' investment; (2) the severity of the May 2009 Memorandum of Understanding with the Office of Thrift Supervision; (3) that Lydian Bank had not implemented the policies mandated by the OTS; (4) Lydian's subordinate debt should have offered offer yields double the dividend offered to Plaintiffs; and (5) that Lydian Bank had made a provision for a bad debt expense of more than $27 million at the end of June 2009.

[7] The Subscription Agreement states that "[Plaintiffs] have received, carefully read an am familiar with this Subscription Agreement, the [PPM] . . . .  In particular, I reviewed and understand the risks enumerated in the "RISK FACTORS" section of the memorandum.  DE 151-3 at ¶ 2.1.  Plaintiffs also conceded that they read the PPM before executing the Subscription Agreement.  DE 179 at 2.

11

every subject of any purported misrepresentation or omission made to Plaintiffs

and effectively disclaimed liability for Brown's purported omissions.[8]

For example, the "RISK FACTORS" disclosed the existence of the May

2009 Memorandum of Understanding in the following manner:

> In May 2009, the Bank entered into an informal memorandum of
> understanding with the OTS.  It relates primarily to the Bank's asset
> quality and loan loss reserves, and requires that the Bank submit plans
> and report to the OTS regarding its loan portfolio and profit plans.
> We are not required to maintain capital ratios that exceed those
> required by regulation.  Further the Bank had already completed
> the implementation of practices and procedures on its own initiative
> that the Bank believes satisfy many of the terms of the Memorandum.

DE 151-2 at 32.  While Plaintiffs claim that this language was misleading, because

Lydian Bank had not implemented the policies at issue, the fact that the

Memorandum of Understanding was disclosed demonstrated that Plaintiffs were

aware of regulatory action taken by the OTS.  Although Plaintiffs argue that they

---

[8] Examples of the "RISK FACTORS" included in the PPM include statements that that "[o]ur financial condition and results of operations would be adversely affected if our allowance for loan losses is not sufficient;" (DE 151-2 at 26) "[c]hanges in bank regulations may require us to increase our allowance for loan losses, which could have a negative effect on our financial condition;" (*id.*) "[o]ur valuation of certain assets and liabilities may include methodologies, estimations and assumptions which are subject to differing interpretations and could result in changes to valuations that may materially adversely affect our results;" (*id.*) "we are subject to extensive regulation and supervision that could adversely affect our business" (*id.* at 24) and "[w]e are subject to regulatory[sic] capital adequacy guidelines, and if we fail to meet these guidelines we may be subject to regulatory action;" (*id.*) and that "[a]n applicable regulatory authority may determine that we must change our strategy or impose restrictions or requirements that limit our business flexibility. The effects of any potential action by a regulatory agency or changes in 1aw and regulations cannot be predicted but could adversely affect our business and operations." *Id.* at 31.

were not provided with Lydian Bank's audited financial statements, they could have obtained such, as evidenced by the language in the Subscription Agreement,[9] and testified that they never attempted to obtain any information aside from what was presented to them.[10]  DE 179-1 at 34 (Ceruzzi Deposition); DE 179-2 at 46 (Hooper Deposition).  Since Plaintiffs had the ability to obtain any information readily available to the bank, and stated that they were only relying on their own experts in making their decision to invest, they effectively disclaimed any right to pursue Brown for negligent misrepresentation as a result of his purported omissions.  Likewise, Plaintiffs' argument that that the PPM and Subscription Agreement as executed were ambiguous because they did not fully disclose all facts relating to Lydian Bank's condition, does not justify the imposition of liability on Brown for his purported misrepresentations.[11]

---

[9] The Subscription Agreement states that Lydian Bank provided Plaintiffs and/or their advisers "an opportunity to obtain any additional information, to the extent that [the bank possesses] it or can acquire it without unreasonable effort or expense. . ." (DE 151-3 at ¶ 3.3)

[10] *See infra* note 15.  While Plaintiffs' depositions were filed under seal, only portions which do not contain sensitive personal information are quoted in this Order.  Louis Ceruzzi served as Plaintiff BVS Acquisitions Company's representative during this cause of action.

[11] Although Plaintiffs claim that the Brown's failure to disclose that Ellis received a commission for his services also provides a basis for relief, they failed produce evidence demonstrating that such a disclosure would have affected their decision to invest in Lydian bank. *See* DE 179-1 at 30-40 (Ceruzzi Deposition) ("I cared that the bank was sound, the bank was profitable, that the bank had its loan, potential loan losses covered.").  Accordingly, this failure cannot sustain a claim for negligent misrepresentation.

13

Although Plaintiffs assert that the parties' discrepancy of how to interpret the PPM and Subscription Agreement presents a material issue of fact, their interpretation results in the invalidation of provisions of the contract, which is contrary to Florida law.

Under Florida law, courts are to interpret the terms of a contract to give meaning to all of its provisions. *USB Acquisition Co., Inc. v. Stamm*, 660 So. 2d 1075, 1080 (Fla. 4th DCA 1995) ("If clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible") (citing *Triple E Dev. Co. v. Floridagold Citrus Corp.*, 51 So. 2d 435, 438-39 (Fla. 1951); *Ceradini v. IGT Services, Inc.*, 959 So. 2d 348, 351 (Fla. 3d DCA 2007) (internal citations omitted) ("a cardinal principal of contract construction that agreements are to be interpreted so as to give meaning to all their provisions."). Because Brown's interpretation guarantees that all of the provisions of the PPM and Subscription Agreement taken as a whole are given effect, under Florida law, I am required to apply Brown's interpretation of the contract.

Plaintiffs also assert that the language of the Subscription Agreement is inapplicable because it was subsequently modified. Specifically, Plaintiffs assert that their "correspondence indicat[ed] that in connection with their provision of the executed Subscription Agreements to be held in escrow, Plaintiffs were relying on

14

the oral representations of [Brown] and Ellis regarding the Preferred Shares, the subsequent acknowledgement of same by Ellis as representative of the Bank and at Brown's direction or knowledge." DE 179 at ¶ 26.  While Plaintiffs assert that Brown approved or had knowledge of Ellis' acceptance of the representation, Plaintiff Hooper testified that Brown did not agree to incorporate the letter into the Subscription Agreement and PPM.  DE 179-2 at 42.[12]  Further, the language of the Subscription Agreement that provides that "[t]his Subscription Agreement, along with the [PPM] and each of the Exhibits, constitute the full and entire understanding and agreement between the parties[,]" also prevents modification of

---

[12] Hooper testified during his deposition as follows:

Q: So just so I am clear, because I am a little bit confused, when you asked for these four things, the commitment for capital telecom, the commitment for the preferred, the shares of Digital Domain, and a bunch of other representations, that was something you asked for of Mr. Ellis after the meeting with Mr. Brown and Mr. Ellis?
A: That's correct. I –you have some covenants, and some representations. You understand the difference I'm sure.
Q: Sometimes I do. But that was a request you made of Mr. Ellis.
A: That's correct.
Q: In a telephone call afterwards?
A: That's correct.
Q: And you wanted that as part of the closing document?
A: That's correct.
Q: And you did not get that?
A: I did not get. He said that he checked with Mr. Brown and that he couldn't do that. They would have to amend the whole offering, and there was a bunch of reasons I was given - - why he would accept a generic statement but not a specific statement.

DE 179-2 at 42.

15

the Subscription Agreement.[13]  DE 162-2 at ¶ 9.  Thus, Brown is entitled to Summary Judgment on Count I.

## B.  BREACH OF FIDUCIARY DUTY

While, Plaintiffs claim that Brown owed them a fiduciary duty as a result of "his knowledge as the dominant CEO of Lydian Bank" and that he was obligated to disclose "any information were not readily available to Mr. Hooper and BVS," they have failed to demonstrate the existence of a fiduciary relationship in the transaction at issue.[14]

A claim for a breach of fiduciary duty requires proof of: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately caused by the breach.  *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. 4th DCA 2007) (citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)).  In order to establish the existence of a fiduciary duty, a plaintiff "must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."  *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*,

---

[13] The Subscription Agreement goes on to state that with regard to the subjects of this Subscription Agreement and the [PPM] and supersede any and all prior understandings and agreements whether written or oral, with respect to such subject, which shall have no further force or effect.  No party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth in this Subscription Agreement and in the [PPM]." *Id.*

[14] I am also hard pressed to find that a fiduciary duty existed when Plaintiffs' reliance on Brown's statements was unreasonable as a matter of 1aw as previously discussed.

16

850 So. 2d 536, 540 (Fla. 5th DCA 2003) (citing W*atkins v. NCNB Nat'l Bank of Fla., NA.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 2001).  But "[i]n an arms-length transaction, however, there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered."  *Id.* at 541 (citing *Watkins*, 622 So. 2d at 1065-66).  Thus, a fiduciary duty only "exists where confidence is reposed on one side and there is resulting superiority and influence on the other."  *Atlantic Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1332-33 (Fla. 2d DCA 1985).

Plaintiffs rely on three cases where Florida courts have imposed liability upon banks for breach of fiduciary duty.  *See Barnett Bank of West Fla. v. Hooper*, 498 So. 2d 923 (F1a. 1986) (finding that fiduciary duty may be found between bank and customer); *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 520 (Fla. 3d DCA 1994) (finding bank breached fiduciary duty to customer); *Atlantic Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1333 (Fla. 2d DCA 1985) (finding fiduciary relationship existed between bank and customer).[15]  However, none of these cases involve the imposition of liability on an individual because of a breach of duty with a customer and a bank.

---

[15] Plaintiffs also rely on *Hinson v. Drummond*, 347 So. 913 (Fla. 1929). However, its holding has been implicitly overruled by *First Interstate Development Corp. v. Ablanedo*, 511 So. 2d 536 (Fla. 1987) and is therefore of little precedential value. *See Parker v. State of Florida Bd. of Regents*, 724 So. 2d 163 (F1a. 1st DCA 1998) (recognizing implied overruling of *Hinson*).

17

While these cases do not authorize the imposition of personal liability, they hold that banks owe their customer a fiduciary duty in "special circumstances" where a bank has an established confidential or fiduciary relationship with a customer, from which the bank stands to benefit, and has information not otherwise available to the customer. *Hooper*, 498 So. 2d at 925-26. In *Hooper*, the Florida Supreme Court found that such special circumstances were present where the defendant bank used its superior knowledge to induce a customer into investing money with another customer who had been involved in a check kiting scheme. In so holding, the Florida Supreme Court held that because the bank stood to benefit, and the plaintiff could not have learned of the purported check kiting scheme that the bank was under an obligation to disclose material facts. In *MVB*, the Third District Court of Appeals found that a fiduciary duty existed when the defendant bank used its established relationship with its client to prevent its client from conducting due diligence before entering into the contract at issue. *MVB*, 644 So. 2d at 519-21. In *Vest*, the Second District Court of Appeals declined to find the existence of a fiduciary relationship where the parties had "acquired equal status," and the plaintiff knew that an officer from the defendant bank was simply repeating "information she had received from another source." *Vest*, 480 So. 2d 1333.

18

Here, Plaintiffs have failed to present special circumstances which justify a finding of the existence of a fiduciary duty. Brown only met Plaintiffs on two separate occasions. At the first meeting, Brown discussed investing in Lydian Bank, and was described as having a demeanor similar to that of a "cheerleader." DE 179-1 at 44. The purpose of the second meeting was to discuss Plaintiffs' ability to obtain stock in a company called Digital Domain as incentive to invest in Lydian Bank, and not Lydian Bank's financial situation. There is no evidence that Brown used his position at Lydian to induce Plaintiffs into investing, or Plaintiffs' purported status as wealth management clients affected their decision to invest. Plaintiffs have also failed to introduce evidence that Brown had access to information which was not available to them because pursuant to the language of the PPM and Subscription Agreement, any information known by Brown and not Plaintiffs was made available to Plaintiffs at their request.[16] Since there was no

---

[16] Plaintiffs did not to attempt to obtain such information which easily could have been discovered, thereby eliminating any superiority or influence which Brown might have enjoyed as a result of his position. Specifically, Plaintiff Hooper testified as follows:

> Q: And you did no due diligence or other – except talking to Brown Brothers Harriman in connection with this investment?
> A: I was talking to the two most knowledgeable people at the bank.
> Q: Just answer my question.
> A: Yes. The answer is yes. I did consult with two people [Brown and Ellis].
> Q: And you did not ask for any other documents other the ones that were provided to you in the Power Points and the offering memoranda, correct?
> A : That is correct.

19

disparity of information or superiority and influence in the transaction at issue, Brown was not obligated pursuant to any fiduciary duty to disclose the purportedly omitted information.

Plaintiffs also claim that Brown's failure to comply with the OTS regulations and GAAP violated a post-purchase fiduciary duty. However such a claim is derivative in nature, and belongs to the FDIC and not Plaintiffs. *See Lubin v. Skow*, 382 F. App'x 866, 868 (11th Cir. 2010) ("Where a shareholder alleges

---

DE 179-2 at 46. Likewise Ceruzzi testified as follows:

> Q: Did you or anyone on your behalf do any due diligence about Lydian private bank or Lydian holding company before making the investment in the preferred.
> A: No. We just looked at the information that was provided to us.
> Q: What information was provided to you?
> A: The information in the Power Points. . . .
> Q: Anything else?
> A: We relied on the answers we received to our questions.
> Q: Did you see a private placement memorandum?
> A: I did.
> Q: Did you see two of them.
> A: I recall seeing one of them.
> Q: Okay. And you never asked to have anybody talk to any of the other officers of the bank is that correct?
> A: That's correct.
> Q: You never asked to have anybody look at the bank's records; is that correct?
> A: Correct.
> Q: Did you ask to see the audited financial statements of the bank?
> A: We did not.
> Q: Did you ask for any other documents?
> A: No.

DE 179-1 at 34.

20

devaluation of shares due to corporate mismanagement, that shareholder lacks standing to sue the corporate officers directly.") (citing *Stevens v. Lowder*, 643 F. 2d 1078, 1080 (5th Cir. Unit B Apr. 1981). Because I find that no fiduciary relationship exists, Count II cannot survive summary judgment.

For the foregoing reasons, it is hereby **ORDERED and ADJUDG ED** that Brown's Motion is hereby **GRANTED**. All pending Motions **EXCEPT** for Plaintiffs' Motion to Dismiss Answer to Amended Complaint (DE 197) and Plaintiffs' Motion to Strike Answer to Amended Complaint (DE 198) are hereby **DENIED as MOOT**. The Parties may brief the aforementioned Motions in the ordinary course of proceedings.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 29 day of October, 2012.

21